United States Court of Appeals,

Fifth Circuit.

No. 96-30220.

DOCTOR'S HOSPITAL OF JEFFERSON, INC., Plaintiff-Appellant,

v.

SOUTHEAST MEDICAL ALLIANCE, INC. and Jefferson Parish Hospital
Service District No. 2, Defendants-Appellees.

Sept. 25, 1997.

Appeal from the United States District Court for the Western
District of Louisiana.

Before JONES and WIENER, Circuit Judges, and FURGESON, District
Judge.[1]

EDITH H. JONES, Circuit Judge:

Doctor's Hospital of Jefferson, Inc. ("DHJ") filed suit
against a competing hospital located next door in suburban New
Orleans and the preferred provider organization ("PPO") which
welcomed the competitor into membership and booted out DHJ. The
district court granted summary judgment to the PPO, Southeast
Medical Alliance, Inc. ("SMA"), and the competing hospital,
Jefferson Parish Hospital Service District No. 2 ("East
Jefferson"). The court reasoned that DHJ lacked standing to bring
an antitrust suit against appellees because it had failed to
demonstrate antitrust injury. Although we disagree with the
district court's analysis of the standing issue, we affirm the
grant of summary judgment on other grounds. Plaintiff failed to
establish injury to competition as required for a Section 1 claim,

_____

[1]District Judge of the Western District of Texas, sitting by
designation.

1

and its Section 2 monopoly claims fail for want of an appropriate relevant market.

## I. Background

Since the district court granted summary judgment against DHJ, we view the facts and all reasonable inferences therefrom in favor of DHJ. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

East Jefferson, a non-profit, 556-bed hospital, opened in 1968 in Metairie, Louisiana, to serve the East Bank of Jefferson Parish. In 1984, DHJ opened as a for-profit, 138-bed hospital next door to East Jefferson.  The hospitals are so close that doctors on staff at both facilities routinely walk between them.

SMA was formed by DHJ and other hospitals in 1988.  SMA is a not-for-profit PPO consisting of member hospitals, which have two seats each on the board of SMA, and participating hospitals, which contract to provide services to SMA but have no ownership interest in SMA. SMA markets a package of discount services at its member and participating hospitals to employers, insurance companies, professional associations and other purchasers of group health benefits.  An individual consumer covered by SMA is free to see any doctor or use any health-care facility that he chooses, but the consumer must pay more to use a provider outside the network.

DHJ was a member hospital of SMA until January 1990, when DHJ canceled its membership because it had received virtually no revenues from SMA. However, DHJ continued to serve SMA customers, and in February 1991, DHJ and SMA entered into a participating

hospital contract terminable by either party upon ninety days written notice.

From 1989 through 1992, SMA grew rapidly, increasing its New Orleans area enrollment from 6,700 in February 1990 to 233,000 in 1993. By 1993, there were 14 PPOs in the greater New Orleans area. American LIFECARE had the largest enrollment, followed by SMA and Healthcare Advantage.[2]

Managed care revenues grew to represent 21 percent of DHJ's total revenues as of June 1993. Revenues from SMA approached $200,000 per month, or 6 percent of DHJ's total revenues.

In 1992, SMA's member hospitals were Tulane Medical Center, Southern Baptist Hospital, West Jefferson Hospital, Lakeside Hospital, and Slidell Memorial Hospital. Although SMA officials had approached East Jefferson about affiliating with the PPO as early as 1989, while DHJ was still a member, negotiations began in earnest to attract East Jefferson sometime in 1992. Prior to and during this time, DHJ also expressed interest in once again becoming an SMA member hospital. Responding to a letter on this subject from DHJ's president, the Executive Director of SMA assured DHJ in August 1992 that DHJ's request would be "on the agenda" at SMA's October board meeting. Instead of considering the DHJ request, however, in November, SMA entered into a contract calling for East Jefferson to join SMA, first as a participating hospital and later as a member. At its March 1993 meeting, SMA's board of

---

[2]However, as of 1994, Healthcare Advantage had become the second largest PPO and SMA had dropped behind to third.

3

directors decided to accept East Jefferson as a member hospital and terminate DHJ as a participating hospital.  DHJ was given written notice of termination.

By August 31, 1992, DHJ was under contract to provide services to Healthcare Advantage.  Including Healthcare Advantage, DHJ was affiliated with six PPOs after its termination by SMA in 1993.[3]

Upon its termination by SMA, DHJ filed suit alleging federal and state antitrust violations as well as other state claims.  DHJ asserted that East Jefferson and SMA illegally restrained trade in violation of Section 1 of the Sherman Act by conspiring to restrict competition through exclusion of DHJ from the SMA network.  DHJ likened this restraint to a concerted refusal to deal or a group boycott by competitors.  DHJ's Section 2 claims rested on the allegation that East Jefferson had attempted to monopolize and conspired to monopolize the hospital services market on the East Bank of Jefferson Parish by using its market power to condition its entrance into SMA on the exclusion of DHJ. DHJ asserted damages from the loss of SMA revenues and damage to its ability to compete effectively in the marketplace.

DHJ's expert economist, Dr. Henry Zaretsky, defined the relevant product market for both claims as general-acute inpatient services and hospital-based outpatient services (collectively "hospital services") and the relevant geographic market as the East Bank of Jefferson Parish.  Dr. Zaretsky described the six hospitals

---

[3]In 1994, DHJ was affiliated with five of fourteen PPOs in the New Orleans area and with three of ten Health Maintenance Organizations ("HMO") in the area.

4

within the East Bank as the relevant competitors.[4]  Within those parameters, East Jefferson was the largest competitor, with a 42 percent share of patient days and a 39 percent share of patient discharges.[5]  East Jefferson was followed by Ochsner, with 30 percent of patient days, and St. Jude and DHJ, each with a 9 percent share of patient days.  As a result of the exclusion of DHJ from affiliation with SMA, Dr. Zaretsky suggests that East Jefferson can monopolize hospital services on the East Bank.

Dr. Zaretsky pointed to three anticompetitive effects that could result from the appellees' actions:  1) actual increased prices to SMA subscribers combined with an environment conducive to further price increases, 2) a reduction in consumer choice, in that SMA customers' ability to use DHJ is restricted, and 3) the weakening of DHJ as an effective competitor in the market.  DHJ also offered evidence of East Jefferson's alleged anticompetitive intent, such as attempts to discourage physician groups from admitting patients to DHJ, East Jefferson's strategic reports

---

[4]In addition to DHJ and East Jefferson, Ochsner Foundation Hospital, AMI St. Jude Medical Center, Elmwood Medical Center, and Lakeside Hospital all are located in the East Bank of Jefferson Parish.  East Jefferson and Lakeside hospitals have since entered into an agreement consolidating all obstetrics services to Lakeside hospital.  In addition, Baptist Hospital, although not located in the East Bank and not included in the relevant market by DHJ's expert, enjoys 8.22% market share in the East Bank, behind only East Jefferson and Ochsner.  For further discussion of the participants in the relevant market, see the discussion of the Section 2 claims, *infra.*

[5]The share of patient days was calculated only among the six hospitals actually located in the East Bank, while the share of patient discharges was calculated as a percentage of all New Orleans hospital discharges of East Bank residents.

highlighting the weaknesses of DHJ and other competitors, and various statements by Peter Betts, chief executive of East Jefferson, to the effect that East Jefferson would not join SMA unless DHJ was excluded.

Reviewing this evidence after substantial discovery, the district court granted the defendants' motion for partial summary judgment on the federal and state antitrust claims on the grounds that DHJ had not demonstrated antitrust injury as required to establish its standing to sue.  Upon a motion for reconsideration by DHJ, the district court clarified its reasoning, but reaffirmed the grant of summary judgment for the defendants.  The district court granted final judgment on the dismissal of the federal and state antitrust claims pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and DHJ filed a timely notice of appeal.

## II. Standing and Antitrust Injury

DHJ contends that the district court erred in its analysis of the antitrust injury component of standing and erroneously required proof of injury to competition as an element of standing.  We review the district court's grant of summary judgment de novo. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Standing to pursue an antitrust suit exists only if a plaintiff shows:  1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct;  2) antitrust injury;  and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit.  *McCormack v.*

6

*National Collegiate Athletic Ass'n,* 845 F.2d 1338, 1341 (5th Cir.1988) (citations omitted). The first and third elements of the standing inquiry are not here in dispute.

Antitrust injury must be established for the plaintiff to have standing under section 1 or section 2 of the Sherman Act. *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir.1988).[6] This requirement is inferred from section 4 of the Clayton Act, which affords a remedy to any person injured in his business or property "by reason of" an antitrust violation. 15 U.S.C. § 15(a). In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court described antitrust injury as

> ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Id.* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969));[7] *see also Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328,

---

[6] "Antitrust injury is a component of the standing inquiry, not a separate qualification." *Bell,* 847 F.2d at 1182.

[7] In *Brunswick,* several bowling alley operators sued a bowling equipment manufacturer that had bought failing bowling alleys and provided cash to keep the operations afloat. *Id.* at 479-80, 97 S.Ct. at 692-93. The plaintiffs alleged that the defendant's purchase of the failing bowling alleys gave the defendant significant market power in violation of the antitrust laws, and alleged lost profits resulting from the failing bowling alleys staying in business. *Id.* The court held that the plaintiffs had failed to demonstrate antitrust injury: they were injured by increased, not decreased, competition. *Id.*

7

342-44, 110 S.Ct. 1884, 1893-94, 109 L.Ed.2d 333 (1990).

The district court believed that the antitrust injury component of standing embodies a showing of injury to competition in the marketplace as well as appropriate injury to the plaintiff. Consequently, the court dwelt at length on DHJ's evidence of substantive Section 1 violations and, finding it insufficient for summary judgment purposes, denied standing. The court's treatment of Section 2 standing cursorily incorporated the same logic.

It is unfortunate that considerable judicial resources were spent barking up the wrong tree. *Brunswick, supra,* and this circuit's precedents have tolerably clearly explained antitrust standing for some years in a series of decisions that the appellees and district court overlooked or misunderstood. The *Brunswick* rule was stated earlier. Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability. *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 986 n. 6 (5th Cir.1983). And in 1984, this court explained, albeit in a motion for rehearing, that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing. *Walker v. U-Haul Co.,* 747 F.2d 1011, 1016 (5th Cir.), *modifying,* 734 F.2d 1068 (5th Cir.1984) [hereinafter *Walker II* ].

DHJ is therefore correct in observing that antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct

8

on overall competition. So viewed, DHJ's alleged losses and competitive disadvantage because of its exclusion from SMA fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case. DHJ is a would-be provider of services for SMA and a direct competitor of East Jefferson, the alleged monopolist. DHJ has asserted that SMA and East Jefferson conspired to remove DHJ from SMA in response to East Jefferson's market power and in order to weaken it as a competitor for East Jefferson. Although these theories of antitrust violations arise from the complex and rapidly evolving health care "market," they are hardly novel, and DHJ is no remote or indirect victim of the alleged scheme. DHJ's alleged injury flows from the allegedly exclusionary conduct of its competitor East Jefferson and is exactly the kind of anticompetitive effect that East Jefferson sought. To require summary judgment proof of the substantive violations as a prerequisite to antitrust injury and therefore standing to sue in a case such as this is inefficient and confusing.[8]

Another way to explain the standing inquiry is that it ensures

---

[8]In *Walker II*, 747 F.2d at 1016 n. 9, we said that "[t]o demonstrate antitrust injury, [the plaintiff] must "formulate a plausible substantive claim sufficient to survive summary disposition.' " Too much should not be made of this statement, however, for at the same time, the opinion acknowledged that the plaintiff there had standing, and it granted summary judgment on the merits. More importantly, *Walker II* was clarified in *Bell, supra,* which avoided an antitrust injury inquiry by resorting to the easy conclusion that the plaintiff's damage claim was too speculative. *Bell,* 847 F.2d at 1183 (citing *Associated Gen. Contractors v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723, (1983)).

that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors. Because the lure of treble damage recovery for otherwise ordinary tort and contract actions has inspired "antitrust" lawsuits that do not fulfill these goals, the standing test is often a useful filter at an early stage of litigation. Standing analysis can be most helpful in the atypical antitrust case if the court assumes an antitrust violation has occurred and then determines whether the plaintiff has suffered injury-in-fact, is a proper plaintiff and has experienced "antitrust injury" from the violation. *See* 2 Areeda and Hovenkemp, Antitrust Law ¶ 360f, at 204 (1995 ed.). But standing should not become the tail wagging the dog in "classical" antitrust cases such as this one by an allegedly excluded competitor.

If the plaintiff does not eventually produce evidence to create a material fact issue concerning an antitrust violation, then summary judgment should be granted on that basis. Although summary judgment could theoretically be based on standing, since without the showing necessary for an antitrust violation, a plaintiff cannot show that his injuries are of the type the antitrust laws were designed to prevent, the better path is to grant summary judgment for defendants on the merits. In urging this approach, we follow the Eleventh Circuit citing the advice of Professors Areeda and Hovenkamp:

> When a court concludes that no violation has occurred, it has no occasion to consider standing.... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust

10

injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.

*Levine v. Central Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1545 (11th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996) (quoting Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 360f, at 202-03 (rev. ed.1995)).[9]

The district court erred in holding that injury to competition in the market was a prerequisite of DHJ's antitrust injury and in denying standing rather than addressing the claims' merits for summary judgment purposes. To that task we turn.

### III. Alternative grounds for summary judgment

The grant of summary judgment may still be affirmed if DHJ's evidence is insufficient to create a genuine issue of material fact concerning substantive violations of the antitrust laws. A district court's grant of summary judgment may be affirmed on grounds supported by the record other than those relied on by the court. *Forsyth v. Barr,* 19 F.3d 1527, 1534 n. 12 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).[10]

---

[9]*Accord Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1109 n. 2 (5th Cir.1979) (assuming standing and affirming summary judgment on grounds that plaintiff failed to show antitrust violation); *Hardwick v. Nu-Way Oil Co.,* 589 F.2d 806, 807 n. 3 (5th Cir.), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

[10]As an initial matter, DHJ argues that since only the standing issues were addressed by the district court Order granting motions

A. Section 1 violation

The question at the heart of the district court's order is whether DHJ has shown harm to competition sufficient to demonstrate a Section 1 violation because of its exclusion from SMA.[11] DHJ's theory is that SMA and East Jefferson entered into a concerted refusal to deal which wrongfully foreclosed competition for the contract to provide services to SMA subscribers in the East Bank of Jefferson Parish.

As DHJ does not allege on appeal that the defendants' actions were per se unlawful,[12] it must show that the complained-of actions

---

for partial summary judgment and Order denying motion for reconsideration, only these orders were certified as final pursuant to Rule 54(b), and because these are the only two orders referenced in its Notice of Appeal, this court lacks jurisdiction to consider any of the alternative grounds for affirmance raised by appellees. DHJ relies on *United Industries v. Eimco Process Equip. Co.,* 61 F.3d 445, 448 (5th Cir.1995), which held that in an interlocutory appeal certified under 28 U.S.C. § 1292(b), the court lacked jurisdiction to consider district court orders outside the scope of certification.

DHJ's reliance on *Eimco* is misplaced. This is not an appeal of an interlocutory order certified under section 1292(b), but a partial summary judgment certified as final under Rule 54(b) and over which jurisdiction exists under section 1291. As such, a notice of appeal identifying the district court's order dismissing DHJ's antitrust claims properly confers jurisdiction on this court over all interlocutory orders on the way to that partial final judgment.

[11]Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

[12]In its memorandum opinion, the district court rejected DHJ's claim of per se liability, and DHJ does not here contend that this part of the decision was incorrect. We agree with the district court that this is not a case appropriate for per se treatment. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50

12

unreasonably restrained trade. *Multiflex,* 709 F.2d at 986. To prove a Section 1 violation under rule of reason analysis, DHJ must show that the defendants' activities caused an injury to competition. *See Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1385 (5th Cir.1994), *cert. denied,* 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995). Thus,

> Under the rule, the anticompetitive evils of a restrictive practice must be balanced against any procompetitive benefits or justifications within the confines of the relevant market. Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason.

*Hornsby Oil Co. v. Champion Spark Plug Co.,* 714 F.2d 1384, 1392 (5th Cir.1983).

As their principal answer to each of DHJ's alleged harms to competition, the appellees contend that this case is governed by the substitution of dealer cases which hold that a manufacturer has a virtually absolute right to choose to whom it sells its goods. *See, e.g., Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975); *H & B Equip. Co. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir.1978). Even where the dealer substitution occurs at the insistence of the new dealer, and even when the new dealer and the manufacturer agree before the termination of the old dealer that the substitution will occur, there is no antitrust violation. *Burdett Sound,* 515 F.2d at 1249.

DHJ distinguishes such precedents because, unlike the typical dealer substitution case where the manufacturer is acting

---

n. 16, 97 S.Ct. 2549, 2557 n. 16, 53 L.Ed.2d 568 (1977); *see also* discussion of DOJ guidelines, *infra.*

unilaterally in its best interests or pursuant to a vertical agreement with the new supplier, this case involves horizontal action by East Jefferson and other hospitals to remove a competitor. *See Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764-66, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).[13] DHJ argues that substantial evidence tends to prove that East Jefferson and the SMA hospitals "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473.[14]

Although a provider-controlled PPO generally embodies elements of a horizontal restraint of trade simply by "preferring" the members which are its providers, no adverse antitrust consequences follow from this characteristic alone. Subsidiary PPO agreements to divide markets or fix prices might pose troubling antitrust issues, but DHJ advances no such claims here. And it is generally recognized that PPOs can, in the proper circumstances, lower the cost of medical care to consumers by allowing negotiation of lower prices through consumers' representatives, such as employers or insurance companies. In conceding this possibility, DHJ concedes that the impact of particular decisions by any PPO must be

---

[13]DHJ also contends that a dealer substitution caused by a rival with substantial market power in order to establish market dominance is illegal. *See Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). This argument relates to a claim of monopolization or attempted monopolization and is addressed below with DHJ's Section 2 claims.

[14]Inconsistently, DHJ considers the members of SMA competitors in this context, but only lists East Jefferson and one other SMA member, Lakeside Hospital, among those hospitals competing in what it defines as the relevant market.

considered in light of general market conditions.

Thus, while this case presents almost the exact converse of most substitution of dealer cases, rule of reason analysis is the same for both. In the paradigm cases, the manufacturer substitutes one dealer (who sells the manufacturer's product) for another at the insistence of a competing dealer, while here, the PPO (which sells a mix of providers' products as a separate product) has substituted one provider for another allegedly at the insistence of a competing provider. Nonetheless, unless affiliation with the particular PPO is necessary to enable DHJ to compete, this substitution, like the substitution of a dealer, should not be expected to injure competition.

A critical element in analyzing the antitrust impact of PPO actions is the level of competition among PPOs and with other forms of managed and non-managed health care.[15] The purchasers of managed care services are the employers, insurance companies and other entities who control which plan a group of individuals will join. The necessity of competing for the "covered lives" controlled by purchasers ensures that, in a marketplace with alternative health care networks available, the effect of substituting one provider for another in a particular PPO is limited. Competition among managed-care plans checks any anticompetitive effects of market power achievable from aggregating providers of hospital services in

---

[15]Competition among PPOs may not be considered in isolation from HMOs or other traditional or non-traditional vehicles for delivery of health services; all of which are substitutable. *Blue Cross and Blue Shield United v. Marshfield Clinic,* 65 F.3d 1406, 1409-10 (7th Cir.1995).

15

much the same way as interbrand competition "provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51 n. 19, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977). Just as vertical location restrictions imposed by manufacturers on dealers have the potential for "simultaneous reduction of intrabrand competition and stimulation of interbrand competition," *id.* at 51, 97 S.Ct. at 2558, restricting the number of health care providers affiliated with a PPO can simultaneously reduce competition among them and stimulate competition between health service networks.

The Department of Justice guidelines relating to PPOs reflect this understanding:

> A rule of reason analysis usually is applied in judging the legality of excluding providers from a multiprovider network. The focus of the analysis is not on whether a particular provider has been harmed by the exclusion, but rather whether the exclusion reduces competition among providers in the market and thereby harms consumers. Therefore, exclusion may present competitive concerns if providers are unable to compete effectively without access to the network, and competition is thereby harmed. The Agencies also recognize, however, that there may be procompetitive reasons associated with the exclusion, such as the provider's competence or ability and willingness to meet the network's cost-containment goals. In addition, in certain circumstances network membership restrictions may be procompetitive by giving non-member providers the incentive to form other networks in order to compete effectively with the network.

DOJ Enforcement Policy, 1994 WL 642477 at *42.

Applying the rule of reason here, DHJ has not presented evidence that affiliation with SMA was necessary to compete in the marketplace or that its exclusion from SMA somehow reflected injury to competition generally. Although we assume for present purposes

16

that DHJ was damaged as a result of its termination by SMA, that managed care revenues are of growing importance to DHJ, and that East Jefferson intended to harm DHJ by insisting upon its termination from SMA, DHJ cannot show that it was rendered unable to compete because of the termination. Soon after leaving SMA, DHJ affiliated with Healthcare Advantage, a larger PPO which East Jefferson had left in order to join SMA. Further, the number of providers available to the ultimate consumers was not reduced. The ability of purchasers to choose managed care plans based upon DHJ's allegedly lower costs was unchanged, as DHJ's services remained available to consumers through several other managed care networks. *See Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1393 (10th Cir.1992) (switching hospital's exclusive anesthesiologist provider was mere reshuffling of competitors that does not affect market from consumers' point of view); *Balaklaw v. Lovell,* 14 F.3d 793, 798-99 (2d Cir.1994) (same).[16]

Initial skepticism about DHJ's ability to create a fact issue concerning injury to competition is reinforced by examining DHJ's specific contentions.

1. Increased prices. First, DHJ alleges that as a result of its removal from SMA and the admission of East Jefferson, prices for hospital services in the East Bank of Jefferson Parish have

---

[16]*See also BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664, 667-68 (7th Cir.1994) (collecting cases involving a hospital's decision to terminate or substitute providers and noting that the "hundreds or thousands of pages" in West publications addressing this topic "almost always come to the same conclusion: the staffing decision of a single hospital was not a violation of Section 1 of the Sherman Act").

17

increased and there is a substantial threat that they will continue to increase in the future. DHJ argues that although PPOs can in theory negotiate better prices with providers by reducing the number of hospitals in a single territory and thereby assuring greater volume to the provider, that has not occurred here. DHJ asserts that the rates SMA negotiated with East Jefferson were higher than DHJ and other hospitals in the SMA network had been charging. DHJ's expert theorized that because SMA had not taken bids on the contract to provide hospital services in the East Bank area and had decided to negotiate only with East Jefferson, East Jefferson exhibited the leverage necessary to charge higher rates. SMA, according to Dr. Zaretsky, needed East Jefferson more than East Jefferson needed SMA.[17]

Even if East Jefferson's prices are higher than DHJ's prices to SMA, as Dr. Zaretsky asserted, that only shows that prices have increased for individuals covered by the SMA plan. It does not demonstrate injury in the East Bank market as defined by DHJ.

Contrary to the appellees' assertions, however, evidence that

[17]The parties vehemently dispute whether East Jefferson actually negotiated higher prices with SMA. Although East Jefferson's contract with SMA clearly calls for higher rates for a number of procedures, determining which hospital charged SMA more for actual patient visits is a complicated inquiry. The provider contracts contain provisions capping the maximum discount for billed services, giving different discounts for different procedures, and otherwise confusing the inquiry into the price charged on PPO business. Dr. Zaretsky's report concluded that DHJ's charges were cheaper in practice, while East Jefferson produced a Deloitte & Touche report concluding that East Jefferson's charges were cheaper in practice. For purposes of this appeal, we assume that East Jefferson was able to negotiate a contract with SMA that paid it a higher price for its services than DHJ's contract.

18

their actions have created the potential for anticompetitive effects could under some circumstances support finding a Section 1 violation. *See Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986); *Levine,* 72 F.3d at 1551. To demonstrate the potential for adverse effects in the market, DHJ is required to define the relevant market and establish that the defendants possessed market power. *Levine, supra.* For reasons which will be articulated below in connection with the Section 2 claims, DHJ has failed to establish East Jefferson's market power in any meaningful geographic market. Divorced from the context provided by a relevant geographic market, DHJ's argument that price increases could result from increased concentration in the East Bank of Jefferson Parish is unavailing.

Further, DHJ's analysis of the risk of increased prices is belied by the lack of evidence and by common sense. In medical care, it must be remembered, a provider's higher prices are not necessarily indicative of a less competitive market; they may correlate with better services or more experienced providers. *See Blue Cross and Blue Shield,* 65 F.3d at 1411. DHJ argues that East Jefferson's inflated prices to SMA will be imposed upon customers of other plans because "most favored nations" clauses in plan agreements to which East Jefferson is a party prevent the hospital from charging lower prices to any other plan. DHJ has offered no evidence, however, that the prices East Jefferson negotiated with SMA were higher than those it was already charging its other plans.

19

Without that evidence, DHJ's suspicions are unverified.[18] As for DHJ's fears that the higher prices of East Jefferson could be transmitted to other plans because managed service plans share price information, this is irrelevant to any condemnation of the conduct of East Jefferson.

DHJ also argues that SMA's structure as a provider-controlled PPO makes its actions inherently suspect, since the purpose of such an organization is not to drive down prices, but to benefit the member hospitals. This contention ignores the effect of competition between managed care plans. The other members of SMA, which also provide hospital services to the greater New Orleans area, have no incentive to enable East Jefferson to charge supra-competitive prices at the risk of losing purchasers who prefer a cheaper East Bank hospital. SMA's members are not making the decisions to include or dismiss members in a vacuum: they must be able to market their plan to purchasers of health care benefits. Ultimately, DHJ offers no explanation why the presence of competition between managed care providers, which include at least 17 PPOs and several HMOs in the New Orleans area, will not suffice to prevent the imposition of supra-competitive prices.

Finally, if DHJ truly offers equivalent service at a lower price, then the prices offered to potential purchasers of the Healthcare Advantage plan presumably declined when that PPO

_____

[18]*See also Levine,* 72 F.3d at 1552 (evidence of increased prices in a managed care plan is insufficient to show harm to competition without information on fees charged by providers not in the plan, resource costs, and inflation).

replaced East Jefferson with DHJ in 1992. Perhaps that provides some explanation for Healthcare Advantage's subsequent success relative to SMA.

2. Consumer choice. As additional evidence of impact on competition, DHJ argues that the appellees' actions have reduced consumer choice. DHJ relies on testimony that a number of patients prefer DHJ over East Jefferson. The district court rejected this argument, noting that most physicians on DHJ's staff were also on East Jefferson's staff and that SMA customers can still patronize DHJ if they are willing to pay more. At most, SMA subscribers' choice was reduced, but this was insufficient to show diminished competition in the market.

We agree with the district court. Not only can SMA subscribers still use DHJ at higher prices if they desire, but, critically, the purchasers of health care plans, who select among managed care alternatives, are free to choose one of the six PPOs with which DHJ was still affiliated in 1993. Furthermore, subscribers to Healthcare Advantage now have easier access to DHJ and a more difficult path to obtain East Jefferson's services.[19] *See Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2, 29-31, 104 S.Ct. 1551, 1567-68, 80 L.Ed.2d 2, (1984).

3. Harm to a competitor. DHJ also contends that it has been substantially weakened as a competitor because it lost SMA revenues

---

[19]Surely DHJ does not wish to suggest that its replacing East Jefferson in the Healthcare Advantage PPO is a potential antitrust violation because Healthcare Advantage subscribers' choices have been interfered with.

and has been unfairly deprived of membership in a premiere managed care plan. The district court rejected this injury to a competitor alone as evidence of injury to competition for purposes of an antitrust violation.

While injury to a competitor can be some evidence of injury to competition, *see Multiflex,* 709 F.2d at 986 n. 6, the injuries to DHJ are insufficient under the circumstances to create a fact issue on injury to competition. Dr. Zaretsky noted that SMA revenue was 6 percent of DHJ's total revenue and testified that the increased importance of managed care made access to such plans essential to long-term survival. However, DHJ has not presented evidence that its exclusion from SMA substantially affected its long-term viability as a competitor. Indeed, the evidence suggests the contrary: DHJ's facility has continued to operate under lease to another company and remains a member of numerous managed care plans, including Healthcare Advantage, which, as of 1994, had eclipsed SMA in people covered in the New Orleans area.

Absent evidence that affiliation with SMA is critical to its ability to compete in the marketplace or that East Jefferson has market power in a properly defined market, DHJ's replacement by East Jefferson as a member of SMA, in an otherwise competitive hospital services market, does not present a threat to competition sufficient to violate Section 1.

B. Section 2 Claim

To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant

22

market.[20]  *See Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 319 (5th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986).

"To define a market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services."  2A Phillip E. Areeda *et al.,* ANTITRUST LAW ¶ 530a, at 150 (1995).  The relevant product and geographic markets must reflect the realities of competition. *Brown Shoe Co. v. United States,* 370 U.S. 294, 336-37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962).  Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices. *See Federal Trade Comm'n v. Freeman Hosp.,* 69 F.3d 260, 268-69 (8th Cir.1995).  The possibilities for substitution must be considered. *Blue Cross and Blue Shield United,* 65 F.3d at 1409-10.

East Jefferson asserts that the relevant geographic market urged by DHJ and its expert, Dr. Zaretsky, is too narrowly drawn. The East Bank of Jefferson Parish, advocated by DHJ as a separate market, is in close proximity to Orleans Parish.  The two areas are not separated by any natural boundaries and are connected by numerous roadways.  Dr. Zaretsky reported that 27 percent of

---

[20]To the extent that DHJ relies on proof of the tendency of the defendants' actions to have anticompetitive effects, as opposed to actual anticompetitive effects, DHJ must also establish market power in the relevant market in order to recover under Section 1. *See* discussion of Section 1 claim, supra;  *see also Hornsby Oil Co., Inc. v. Champion Spark Plug Co.,* 714 F.2d 1384, 1392-94 (5th Cir.1983);  *Levine,* 72 F.3d at 1552-53.

admissions to hospitals in Orleans Parish were of East Bank residents.  Furthermore, over 30 percent of East Bank residents obtained hospital care outside of the East Bank. In particular, one of Dr. Zaretsky's tables shows that the hospital with the third largest share of East Bank residents' admissions is Southern Baptist Hospital, a hospital not in the East Bank. On that table, Baptist has a larger market share than DHJ's, yet Dr. Zaretsky excluded Baptist from the relevant market.  Even more probative of the porousness of the assertedly separate geographic markets, 30 percent of both DHJ's and East Jefferson's patients live outside of the East Bank.

DHJ counters that East Jefferson's own internal documents refer to the East Bank as its "primary service area," and SMA documents also describe the East Bank as a distinct geographic area.  DHJ further relies on the opinion of Dr. Zaretsky, which considered major transportation routes, travel times, and area custom and habit.  At a minimum, DHJ urges, fact issues preclude summary judgment on this issue.

We are persuaded that the evidence in DHJ's own expert report establishes as a matter of law that the relevant market cannot be drawn as narrowly as DHJ suggests.  *See Seidenstein v. National Med. Enters., Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985) (stating that relevant market, although usually a fact question for the jury, may be determined as a matter of law).  The facts that over 30 percent of East Bank residents sought hospital services outside the East Bank and that 30 percent of patients at DHJ and East

Jefferson reside outside the East Bank condemn DHJ's designation of the relevant geographic market.  Particularly telling is that the hospital with the third largest market share of East Bank residents' admissions is not included in DHJ's relevant market.[21] Not only has DHJ failed to present evidence that health care purchasers and ultimate consumers could not reasonably turn to hospitals outside the East Bank, *see Freeman Hospital,* 69 F.3d at 268-270, but in fact, the substantial percentage of East Bank residents who currently leave the East Bank for their hospital services is powerful evidence of the alternatives reasonably available to consumers.  In a market that includes hospitals in Orleans Parish, East Jefferson has no opportunity to dominate, much less to attempt or conspire to monopolize.

## IV. Other antitrust claims

DHJ's hope to pursue state antitrust claims and a Clayton Act claim for injunctive relief rest on a reversal of the summary judgment on the other federal claims.  That hope is dashed by the previous discussion.

## V. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court granting summary judgment for appellees SMA and East Jefferson on DHJ's federal and state antitrust claims.

AFFIRMED.

---

[21]In addition to Southern Baptist, two other hospitals outside the East Bank have a larger percentage of the business of East Bank residents than Elmwood, a hospital included in the relevant market by Dr. Zaretsky.

25