IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-30289

JEBACO INC

Plaintiff - Appellant

v.

HARRAH'S OPERATING CO INC; HARRAH'S LAKE CHARLES LLC;
HARRAH'S STAR PARTNERSHIP; PLAYERS LAKE CHARLES LLC;
PLAYERS RIVERBOAT MANAGEMENT LLC; PLAYERS RIVERBOAT II
LLC; PINNACLE ENTERTAINMENT INC.

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and WIENER and BENAVIDES, Circuit Judges.

EDITH H. JONES, Chief Judge:

Jebaco Inc. appeals the dismissal of its federal antitrust claims against
Pinnacle Entertainment and Harrah's Operating Company, Inc., along with five
Harrah's subsidiaries ("Harrah's").[1] The district court dismissed the claims
under Fed. Rule Civ. Proc. 12(c) as barred by the state action doctrine and *Noerr-*

---

[1] These subsidiaries are Harrah's Lake Charles, LLC; Harrah's Star Partnership;
Players LC LLC; Players Riverboat Management LLC; and Players Riverboat II LLC. The
lawsuit names an entity called Players Lake Charles LLC. This is, in fact, Players LC, LLC.
Harrah's Lake Charles, LLC, and Harrah's Star Partnership no longer exist. After being sold
to Pinnacle, they were renamed PNK (SCB), LLC, and PNK (Baton Rouge) Partnership,
respectively.

*Pennington* petitioning immunity. We affirm on the alternate ground, fully briefed below and on appeal, that Jebaco's complaint fails to allege antitrust standing.

After dismissing the federal antitrust claims, the district court declined to exercise supplemental jurisdiction over Jebaco's pendent state law claims. The appellees move, on appeal, to amend Harrah's answer for the purpose of alleging diversity jurisdiction and reinstating the state law claims in federal court. This motion is dismissed.

## I. BACKGROUND

The facts, viewed in the light most favorable to Jebaco, the nonmovant, are as follows. Jebaco does not own or operate any casinos. Players Lake Charles, Inc., did,[2] and in May 1993, it leased two berths in Lake Charles, Louisiana, from the Beeber Corporation to conduct riverboat gambling. Under a separate March 1993 agreement, Jebaco was entitled to receive a portion of the rent, which was a per-patron fee. The parties had a dispute that was resolved in a 1995 settlement agreement, under which Jebaco, again, had a right to receive a per-patron fee. In 2000, Harrah's purchased Players and assumed this payment obligation. Jebaco's rights under the 1995 settlement agreement are its only asset described in the record.

Hurricane Rita struck Lake Charles in September 2005, damaging at least one of Harrah's riverboats and the docking area. Harrah's then ceased operating at this location, halted its per-patron fee payments to Jebaco, and solicited bids for the two riverboats, the gaming licenses associated with the riverboats, and

---

[2] This entity is not a party to the lawsuit, and may no longer exist. It is the Players entity party to the 1995 settlement agreement relevant to this lawsuit.

the real property associated with the berths. Jebaco placed a bid, but Harrah's sold to Pinnacle instead for $70 million, a sum Jebaco asserts is much greater than the property's reasonable value. The purchase agreement between Harrah's and Pinnacle initially contained a clause that required Pinnacle to pay Harrah's $100 million if Pinnacle attempted to transfer the operations, assets, or licenses acquired in the sale to the New Orleans or Shreveport markets. This provision was removed before completion of the sale, however.

According to Jebaco, Harrah's and Pinnacle hold six of the fifteen riverboat gambling licenses in Louisiana and the only land-based gambling license in the state. Jebaco contends that, together, they earn approximately 60 percent of all gaming revenue generated in Louisiana, including 80 percent of the gambling revenue in the New Orleans metropolitan statistical area (MSA), 62 percent of the revenue in the Lake Charles MSA, and 50 percent in the Shreveport/Bossier City MSA.

Gambling is heavily regulated in Louisiana. *See* LA. REV. STAT. ANN. § 27:1, *et seq.* (titled the "Louisiana Gaming Control Law"). The Louisiana Gaming Control Law's explicit purpose is "to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements." § 27:2(A). Consequently, the law "strictly" regulates "persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments," *id.*, by requiring permitting, licensing, and reporting, §§ 27:21.1, 29–29.5, 65, 71, 74, 75, 86; providing for enforcement, §§ 27:19–20; criminalizing certain gambling related activities and violations of gambling regulations, §§ 27:30–30.6; and establishing other rules, qualifications, and procedures.

The law also creates the Louisiana Gaming Control Board ("LGCB"), which has "all regulatory, enforcement, and supervisory authority under the Law," §§ 27:11, 15, including determining whether permit and license applicants are "suitable,"[3] §§ 27:28, 70. The law limits to fifteen the number of licenses available for operating a riverboat casino in the state, with no more than six licenses to be used on any designated waterway at a time.[4] § 27:65. These licenses must be used at a specific berth, § 27:65(12), and are non-transferrable, § 27:68.

Harrah's and Pinnacle agreed they would cooperate to secure the LGCB's approval to transfer the licenses. Pinnacle also applied to use one of the licenses at another location in Lake Charles, a berth in which Jebaco does not have an interest. Further, at a July 18, 2006 public hearing, Pinnacle told the LGCB that it was exploring using the second license at another location, which would deprive Jebaco of all revenue. On August 15, 2006, the LGCB approved both applications, but the second license remains in place.

In the wake of this transaction, but before the LGCB ruled on the petitions, Jebaco sued Pinnacle and Harrah's in federal court seeking monetary and injunctive relief. Jebaco's complaint alleged that Harrah's and Pinnacle

---

[3] A licensee, who operates casinos, and a permitee, who supplies or is employed by casinos, must be "a person of good character, honesty, and integrity," who does not "pose a threat to the public interest," is "capable of and likely to conduct the activities" which he seeks permission to conduct, and is not disqualified by having committed certain enumerated criminal offenses. § 27:28. In addition, riverboat casino licensees must have adequate experience, training, and education, adequate financing, the ability to operate a vessel, detailed design plans, docking facilities, and "a good faith plan to recruit, train, and upgrade minorities in all employment classifications." § 27:70.

[4] Louisiana has also authorized one land-based casino in the New Orleans area, § 27:201–286, which Harrah's owns, two casinos on Indian reservations, and three "racinos."

violated the Sherman Act, 15 U.S.C. §§ 1-2, by dividing the Louisiana casino market and by monopolizing, attempting to monopolize, and conspiring to monopolize that market. Jebaco asserts this alleged anticompetitive conduct deprived it of both the revenue from a casino operating at Jebaco's berths and the ability to purchase Harrah's assets.

Pinnacle and Harrah's moved for a judgment on the pleadings, FED. R. CIV. P. 12(c).[5] Both motions argued that Jebaco failed to allege antitrust standing and that Jebaco's claims were barred by the state action doctrine and *Noerr-Pennington* petitioning immunity. The district court dismissed the antitrust claims, ruling on the latter two arguments without addressing antitrust standing. Jebaco appeals.

Jebaco's complaint also alleged seven Louisiana law causes of action against Harrah's,[6] over which the district court originally exercised supplemental jurisdiction. *See* 28 U.S.C. § 1367. After it dismissed the federal claims, the district court declined to exercise jurisdiction over the pendent state law claims. Harrah's moves, on appeal, to amend its answer to allege diversity jurisdiction over the state law claims.

## II. STANDARD OF REVIEW

We review *de novo* motions to dismiss and motions for judgment on the pleadings. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). The

---

[5] Both defendants titled their motions "Motion to Dismiss," and the district court also used this term. Because both defendants filed an answer before filing this motion, both motions were for a judgment on the pleadings. *See* FED R. CIV. P. 12(c).

[6] These are breach of duty of good faith, negligent breach of contract, breach of contract, breach of accounting and reporting obligation, unfair trade practices, unjust enrichment, and subrogation.

standard is the same for both. *Id.* Viewing the facts as pled in the light most favorable to the nonmovant, a motion to dismiss or for a judgment on the pleadings should not be granted if a complaint provides "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. ____, 129 S.Ct. 1937, 1949-50 (2009). Moreover, the complaint must allege "more than labels and conclusions," "a formulaic recitation of the elements of a cause of action will not do," and "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965.

## III. DISCUSSION

Jebaco alleges that Harrah's and Pinnacle have divided the Louisiana casino market[7] in violation of federal antitrust laws and caused Jebaco to lose per-patron fees and the ability to purchase Harrah's assets and participate in the market.[8] The district court dismissed these antitrust claims after finding them barred by the state action doctrine and *Noerr-Pennington* petitioning immunity.[9] We express no opinion on these exceptions to the scope of antitrust

---

[7] The parties' briefing assumes, as we do for present purposes only, that the Louisiana casino market is a relevant antitrust market.

[8] Neither Pinnacle nor Harrah's contends that Jebaco's allegations of Sherman Act violations are insufficiently detailed to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. ____, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974). We therefore assume that Jebaco's allegations are legally sufficient under FED. R. CIV. P. 8.

[9] The district court's ruling relied heavily on *Astoria Entertainment v. Edwards*, 159 F. Supp.2d 303 (E.D. La. 2001). That case is factually inapposite. There, the plaintiff claimed its unsuccessful riverboat gaming license application was the result of, *inter alia*, federal antitrust law violations. Among the many named defendants were several corporate licensees who were alleged to be participating in a politically corrupt conspiracy to deny the plaintiff a

liability. Instead, we affirm on the alternate ground, fully briefed below and on appeal, that Jebaco has failed to allege sufficient facts that, if true, would establish a plausible claim of antitrust standing. *See Iqbal*, 556 U.S. ____, 129 S.Ct. at 1949–50.

This court has previously described the basic tenets of standing to sue for an antitrust violation, pursuant to Section 4 of the Clayton Act, as follows:

> Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit. . . .
>
> Antitrust injury must be established for the plaintiff to have standing under section 1 or section 2 of the Sherman Act. This requirement is inferred from section 4 of the Clayton Act, which affords a remedy to any person injured in his business or property "by reason of" an antitrust violation. 15 U.S.C. § 15(a).

*Doctor's Hospital of Jefferson, Inc. v. Southeast Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) (citations omitted).[10] In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court described antitrust injury as

---

license. The district court held that the actions of the corporate defendants to lobby and secure their own licenses were protected by *Noerr-Pennington*. The plaintiff did not allege that private actors violated the Sherman Act through an illegal horizontal restraint, as Jebaco does.

[10] These requirements are somewhat relaxed for plaintiffs seeking injunctive relief under Section 16 of the Clayton Act. The injury alleged is not limited to business or property; damages can be simply threatened; and fear of duplicative or speculative recovery will not preclude relief. 15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 & n.6, 107 S.Ct. 484, 489-90 & n.6 (1986).

> . . . injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Id.* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342–44, 110 S.Ct. 1884, 1893–94, 109 L.Ed.2d 333 (1990). In *Brunswick*, several bowling alley operators sued a bowling equipment manufacturer that had bought failing bowling alleys and provided cash to keep the operations afloat. *Id.* at 479–80, 97 S.Ct. at 692–93. The plaintiffs alleged that the defendant's purchase of the failing bowling alleys gave the defendant significant market power in violation of the antitrust laws, and alleged lost profits resulting from the failing bowling alleys staying in business. *Id.* The court held that the plaintiffs had failed to demonstrate antitrust injury: they were injured by increased, not decreased, competition. *Id.* Finally, the focus of remedies available under federal antitrust laws is principally upon consumers or competitors affected by anticompetitive conduct. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538–39, 103 S.Ct. 897, 908–09 (1983); *Norris v. Hearst Trust*, 500 F.3d 454, 465-66 (5th Cir. 2007) ("Plaintiffs [newspaper distributors] were not consumers of the [newspaper] or its advertising services, and they were not producers or sellers of competing publications or media.")

Antitrust injury is at issue here. Jebaco alleges two types of injuries. First, Harrah's and Pinnacle's alleged market division deprived Jebaco of the per-patron fee it used to receive before Harrah's ceased operating at the Lake

Charles berths in which Jebaco had an interest. This aspect of Jebaco's losses thus stems from its position as a landlord or supplier of a berth to the appellees. Second, Jebaco was deprived of the opportunity to compete by purchasing Harrah's Lake Charles assets because only Pinnacle could provide Harrah's with the opportunity to engage in anticompetitive conduct. Jebaco allegedly suffered injury as a would-be competitor. Neither allegation fits comfortably within a "classical" antitrust fact pattern, and both fail to allege antitrust injury.

## A.  *Landlord/Supplier Injury*

Although the allegations of its complaint are vague, Jebaco asserts that its "interest" in the downtown Lake Charles berths derives from its assignment of the right to lease the property for gaming operations in exchange for which Jebaco was to receive per-patron fees from Harrah's well into the 21st century. The casino shutdown caused by Hurricane Rita first interfered with Jebaco's expectation, followed by the transfer of the licenses to Pinnacle and Pinnacle's relocation of the riverboat.

Jebaco characterizes the loss of its per-patron fee "interest" as injury to its "competitive position," but how it was competing or against whom in receipt of the fees is a blank. Under *Twombly*, however, we must accept Jebaco's factual allegations but are not bound to its legal conclusions. *Twombly*, 550 U.S. at 556–57, 127 S.Ct. at 1965–66. The closest, albeit imperfect, market analogies to the Jebaco–casino operator relationship are those of landlord–tenant or supplier–customer. Those relationships, when terminated or modified as a byproduct of "downstream" anticompetitive conduct, have rarely been held to inflict antitrust injury. *See* 2 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW, ¶ 350(f–g), at 422–23 (2d ed. 2000) ("When a downstream firm merely

substitutes one supplier for another, there is certainly injury-in-fact to the terminated supplier, but there is rarely antitrust injury.") (citing *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)); *see also SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 44 (1st Cir. 1995) (finding no antitrust standing for supplier where customer breached agreement with supplier during the course of customer's alleged antitrust violation).

For lessors, the results have been similar. Antitrust injury is not caused by the anticompetitive actions of a tenant in the tenant's market because a lessor is neither a consumer nor a competitor in the downstream market. *Serfecz v. Jewel Food Stores, Inc.*, 67 F.3d 591, 597 (7th Cir. 1995); *see also Henke Enterp., Inc. v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488, 490 (8th Cir. 1984).

Moreover, in this case the market division has little or nothing to do with Jebaco's lost per-patron fees. Had Pinnacle remained at Jebaco's preferred berths and kept paying the fees, the alleged market division would still have occurred, and Jebaco would be uninjured. Alternatively, if a different firm had purchased Harrah's assets, it too might have chosen not to operate at Jebaco's preferred berths. No antitrust violation would have occurred, but Jebaco would have suffered the same injury. *See Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487, 97 S.Ct. 690, 697 (1977) (finding no antitrust injury where the same injury-in-fact would have occurred had a smaller company purchased the competing businesses); *see also Norris*, 500 F.3d at 466; *Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1015 (5th Cir. 1985). Pinnacle's choice to change berths, a choice wholly independent of any antitrust violation, was the cause of Jebaco's injury.

Jebaco's briefing to the district court explains its misconception about antitrust injury. Jebaco argued that "the intent of the defendants' market division was to remove Harrah's current lessors, including plaintiff Jebaco . . . and thereby reduce the business costs of Pinnacle . . . . [T]he purpose of the antitrust laws is to protect small business from larger ones . . . ." This is wrong: The federal antitrust laws protect competition, not competitors. *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697. A lessor's or supplier's injury is not injury to competition except, for instance, where the injury is the direct result of an illegal refusal to deal or a tying violation. Jebaco did not allege that Pinnacle's choice to reposition its licenses in Lake Charles was itself an anticompetitive act.

Jebaco's loss of its per-patron fees is neither the type of injury antitrust law was designed to prevent, nor did it flow from any anticompetitive conduct of Harrah's and Pinnacle. Consequently, Jebaco did not have antitrust standing to sue.

B.      *Potential Competitor Injury*

Characterizing itself, in wholly conclusional terms, as a "potential competitor" of Harrah's and Pinnacle and a "potential bidder" for the casino assets, Jebaco asserts that their market division conspiracy eliminated its ability to enter the market utilizing its Lake Charles berthing interest.

Certain theoretical objections may be initially raised against this claim. For instance, potential competitors must meet a threshold of preparedness to enter a market before they may seek damages from anticompetitive exclusion. *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 313–16 (5th Cir. 1985) (citing *Martin v. Phillips Petroleum Company*, 365 F.2d 629, 633 (5th Cir. 1966)). Such threshold proof is necessary to protect antitrust litigation from

frivolous claims. Following *Twombly* and *Iqbal*, it is likely that Jebaco's mere allegations of potential competitor status, without any facts to demonstrate its financial status or its ability to fulfill the demanding requirements of Louisiana gaming law, are insufficiently pled. Further, any potential competitor's antitrust claim would have to be viewed skeptically in a market where entry is fully controlled by a regulatory body. Nevertheless, we assume *arguendo* that Jebaco satisfactorily pled its preparedness and ability to compete in the casino operating market.

Even as a potential competitor, however, Jebaco's injury did not "flow[ ] from" an antitrust law violation. *See Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697; *see also Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (finding no antitrust standing where plaintiff alleged that an exclusive distribution agreement, for which it lost the bidding, violated the Sherman Act); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (no antitrust injury where one soft drink wholesaler lost out to another in bidding for a bottler's assets). Like the plaintiff in *Bayou Bottling*, Jebaco would have suffered the same harm whether Harrah's retained its Lake Charles assets or sold them to any party other than Pinnacle. The anticompetitive harm caused by the alleged illegal market division is not connected to Jebaco's thwarted hopes.

Jebaco incorrectly insists that it is "within the area of the economy endangered" by the alleged market division, as described by *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479-81, 102 S.Ct. 2540, 2548-49 (1982). In *McCready*, a consumer of psychology services sued her insurer, who had denied her reimbursement, alleging a conspiracy between the insurer and psychiatrists

12

to exclude psychologists from the psychotherapy market by only reimbursing for psychiatric treatment. The Court ruled that the plaintiff had antitrust standing because "the harm to McCready and her class was clearly foreseeable," *id.* at 479; she was "within that area of the economy endangered by that breakdown of competitive conditions," *id.* at 480; and her injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists," *id.* at 484. The key to *McCready*, as this court has noted, was the plaintiff's status as a consumer in the relevant market for whom recovery would not duplicate damages awarded to other potential plaintiffs. *Norris*, 500 F.3d at 467 & n.18 (quoting *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Company*, 48 F.3d 39, 46 (1st Cir. 1995)).

Nor can Jebaco benefit from this court's holding in *Doctor's Hospital*, *supra*, that an actual competitor had standing in a "classic" concerted refusal to deal antitrust case. The plaintiff's alleged injury there was the intended and usual result of anticompetitive conduct. *Doctor's Hospital*, 123 F.3d at 305–06. Here, in contrast, Harrah's selection of Pinnacle from among a number of bidders is distinct from the decision to maintain or reject berths where Jebaco owned an interest, and it is that interest alone which supports Jebaco's status as a potential competitor. Put differently, any conspiracy between Harrah's and Pinnacle to dominate the casino market operated independently of Jebaco's interest. Jebaco, even as a potential competitor, was at most a collateral casualty of the Harrah's-Pinnacle market division agreement.

Jebaco's inability to enter the casino market was not a product of antitrust injury. It was not the type of injury the antitrust laws were designed to prevent, nor did it flow from the alleged anticompetitive conduct.

## C.    Motion to Amend Complaint

The appellees jointly move on appeal to amend Harrah's answer under 28 U.S.C. § 1653 to allege that Jebaco's state law claims satisfy the requirements for federal diversity jurisdiction, 28 U.S.C. § 1332. Section 1653 allows defective allegations of jurisdiction to be amended in the trial or appellate courts. Equating § 1653 with FED. R. CIV. P. 15(a), this court has stated that leave to amend is to be granted liberally unless the movant has acted in bad faith or with a dilatory motive, granting the motion would cause prejudice, or amendment would be futile. *Whitmire v. Victus Ltd.*, 212 F.3d 885, 889 (5th Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1963)). Courts may also consider judicial efficiency, *Nance v. Gulf Oil Corp.*, 817 F.2d 1176, 1180 (5th Cir. 1987) (discussing FED. R. CIV. P. 15(a)), and effective case management, *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992), before granting a motion to amend.

In the typical case, leave to amend is granted, but this is not the typical case. *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006). Jebaco filed a complaint in federal court on August 9, 2006, pleading federal question subject matter jurisdiction for its federal antitrust claim and supplemental jurisdiction for its state law claims. *See* 28 U.S.C. §§ 1331, 1367. Harrah's answered on September 26, 2006, stating that these jurisdictional allegations "do not require a response from Harrah's." For nearly nineteen months, Harrah's failed to correct this apparent misstatement. On March 5, 2008, the district court dismissed Jebaco's federal antitrust claims and then declined jurisdiction over the state law claims. The court had no reason to believe an independent basis for jurisdiction over these claims existed.

Jebaco appealed only the dismissal of its federal antitrust claims. Harrah's did not cross-appeal the district court's decision to decline jurisdiction over the state law claims. Consequently, Jebaco filed its state law claims in state court and Harrah's missed the thirty-day deadline for removing these claims under 28 U.S.C. § 1446(b).

We will not remedy Harrah's apparent mistakes that have resulted in another case pending in state court. Further, one of 28 U.S.C. § 1653's purposes is judicial economy. *Wolfe v. Marsh*, 846 F.2d 782, 785 n.4 (D.C. Cir. 1988) (per curiam); *Nance v. Gulf Oil Corp.*, 817 F.2d at 1180 (discussing FED. R. CIV. P. 15(a)). The appellees have cited no case in which § 1653 was deployed to avert the consistently dilatory conduct they have exhibited.

Harrah's could have cross-appealed the district court's decision to decline jurisdiction over the state law claims, and this court would have reviewed the decision for an abuse of discretion. *See Priester v. Lowndes Cty.*, 354 F.3d 414, 425 (5th Cir. 2004). We do not have appellate jurisdiction over that decision here.

Moreover, an additional problem is that the defendants' citizenship is not evident from the record. Even if we had jurisdiction, were we to grant the motion, it would be necessary to remand the state law claims to the district court to establish the facts underlying diversity. *Mollett v. Penrod Drilling Co.*, 872 F.2d 1221, 1228 (5th Cir. 1989) (per curiam); *Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889-90 & n.2 (5th Cir. 1984) (per curiam). This action would inflict further delay, contrary to the goal of judicial efficiency.

All of this water under the bridge prevents us from granting Harrah's motion, and the authorities Harrah's cites fail to convince.[11] The cases speak broadly about the liberality to be given plaintiffs who have misdescribed or failed to describe jurisdiction that otherwise exists. None involves the series of procedural errors that occurred here or the fatal failure to file a cross-appeal.

Accordingly, the motion is dismissed for lack of jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED**. The motion to amend is **DISMISSED**.

---

[11] These are *Novak v. Capital Mgt. & Dev. Corp.*, 452 F.3d 902 (D.C. Cir. 2006); *Whitmire v. Victus Ltd.*, 212 F.3d 885 (5th Cir. 2000); *Mollett v. Penrod Drilling Co.*, 872 F.2d 1221 (5th Cir. 1989) (per curiam); *Leigh v. NASA*, 860 F.2d 652 (5th Cir. 1988); *Carlton v. Baww, Inc.*, 751 F.2d 781 (5th Cir. 1985); *Nadler v. American Motor Sales Corp.*, 764 F.2d 409 (5th Cir. 1985); *Miller v. Stanmore*, 636 F.2d 986 (5th Cir. 1981); *Miller v. Davis*, 507 F.2d 308 (6th Cir. 1974).