United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 18, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 05-20710

---

WILLIAM T. NORRIS, EDWARD ROSSI, STEVE HALPERN, JIMMY O.
PAYNE, SUE PACKWOOD, AND THOMAS STOVALL,

Plaintiffs-Appellants,

versus

THE HEARST TRUST, THE HEARST CORPORATION, AND HEARST
NEWSPAPERS PARTNERSHIP, L.P.,

Defendants-Appellees.

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs appeal the district court's order dismissing their suit under Rule 12(b)(6). Plaintiffs, six former distributors of the *Houston Chronicle*, a newspaper owned by defendants (Hearst), brought this suit against Hearst alleging breach of contract, wrongful termination under *Sabine Pilot Service Inc. v. Hauck*, 687

S.W.2d 733 (Tex. 1985),[1] and antitrust claims.  Five of the six plaintiffs (all except for Stovall) had previously sued Hearst on some similar state law claims in Texas state court.  They argue that they had nonsuited the presently relevant claims prior to the final judgment dismissing that state court suit.  Hearst moved to dismiss the instant complaint under Rule 12(b)(6) on two grounds: (1) plaintiffs' claims were barred by res judicata and collateral estoppel and (2) plaintiffs had not alleged antitrust injury and lacked antitrust standing.  On September 29, 2004, the district court granted Hearst's motion, dismissing the antitrust claims of the five original plaintiffs on those latter grounds and also dismissing all of their claims on res judicata grounds.  Stoval's antitrust claims were then dismissed on the same antitrust grounds applicable to the original plaintiffs.  Subsequently, on Stoval's motion, his state law claims (other than antitrust) were dismissed without prejudice.  All six plaintiffs have timely appealed.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are six former distributors of the *Houston Chronicle*, a Houston, Texas, daily newspaper published by Hearst. On  June 28, 2002, plaintiffs Payne, Norris, Rossi, Halpern, and Packwood (collectively, the original plaintiffs) filed a suit

---

[1]Sa*bine Pilot* grants a cause of action for at-will employees terminated solely because they refuse to commit a crime. *Id*. at 735.

asserting state law claims against Hearst in the 127th District Court of Harris County, Texas (the state court). In their original petition or first amended original petition in state court, the original plaintiffs claimed that Hearst wrongfully cancelled their distributor contracts in retaliation for "blowing the whistle" on, or complaining about, Hearst's alleged coercion of its distributors to produce fraudulent Houston Chronicle circulation reports. The state court sustained a special exception to the whistle-blower claim, leading the original plaintiffs to file a second amended original petition alleging breach of contract and wrongful termination under *Sabine Pilot*.[2]

Hearst moved for summary judgment on all claims and a hearing was held on November 7, 2003, in state court where the court orally granted defendants' summary judgment motion and specifically stated that the *Sabine Pilot* cause of action could not stand because the original plaintiffs were independent contractors, not employees, and therefore were outside the scope of *Sabine Pilot*.

It is undisputed that the defendants' state court summary judgment motion covered all claims alleged in the second amended original petition and this was specifically stated at oral argument

_____

[2]The asserted criminal activity consists of Hearst's alleged effort to force distributors to fraudulently increase their circulation numbers in their report to Hearst, ostensibly so that Hearst could pass on the falsely augmented numbers to the Audit Bureau of Circulation (ABC) which in turn furnished them to advertisers, whose rates are affected or influenced by them.

The state court second amended original petition also arguably included a separate claim for fraud. However, no such claim is included in the federal complaint which includes only antitrust, *Sabine Pilot* and breach of contract claims.

on the motion.[3]  Although the parties and the court focused on the *Sabine Pilot* claim, the court also plainly indicated its determination that no other cause of action had been adequately alleged.[4]  The court went on to state that it did "grant the defendant's summary judgment that there is no standing by these plaintiffs to raise a *Sabine Pilot* cause of action" and then stated that "I think the law requires that I grant the plaintiffs an opportunity to plead any other causes of action you may have . . . and I will do so, and give you until December the 8th. . . . If you have any other causes of action to plead for breach of contract, you should make those pleadings.  Otherwise, I will dismiss the case *and enter a judgment on the summary judgment dismissing the case*." (emphasis added).[5]  The court concluded the November 7, 2003 hearing by stating: "I grant the summary judgment for the *Sabine*

---

[3]The motion was supported by excerpts from some 10 depositions in the case and by affidavits.

[4]The court observed, *inter alia*: "Let's assume high-handed tactics with regard to contracting with independent contractors, what is your cause of action there;" "The question we have here is what is the remedy under the law, if any, with the circumstances you described;" "you can't sue for tortious interference with regards to people within a corporation;" "you seek here to recover damages not to avoid the contract;" "the law does not recognize contorts or whatever they are called, contractual torts in this instance."  The court further expressed the view that to the extent it were to grant summary judgment on a pleading basis which could have been reached by a failure to state a claim special exception, it would have to grant leave to amend before dismissing the case on that basis.
    Defendants also argued, *inter alia*, that the distributorship contracts had expired by their terms and/or renewal had been tendered and refused (and, in one case of early termination, liquidated damages, presumably those called for by the contract, had been tendered and refused).

[5]The court also stated "And so on December the 8th plead a breach of contract case with damages that are sustainable . . . And so I give you that 30 days . . . it's to plead a valid cause of action with a measure of damages that is recognized by the law that you have, or I'll dismiss it."

4

*Pilot* cause of action as plaintiffs are independent contractors, not employees at will.  Plaintiff granted leave to amend by December 8 as to any breach-of-contract theory.  Otherwise, the case will be dismissed."

The next state court hearing was December 8, 2003, at which time the state court plaintiffs presented and tendered for filing their Third Amended Original Petition.  This again asserted breach of contract and *Sabine Pilot* claims – substantially the same as in the Second Amended Original Petition – and, for the first time in the lawsuit, also asserted claims under the Texas and Federal antitrust laws.  Having reviewed the proposed Third Amended Original Petition, the state court denied leave to amend, the defense then  inquired "would the Court intend to enter a final appealable order at this time," and the court responded, "Just did. The Clerk will give everybody a copy."

The order in question, which was signed and filed by the judge on December 8, 2003, recites that the case came on to be heard on the defendant's motion for summary judgment, that the court had previously sustained that motion and granted plaintiffs leave to amend by December 8, that the court, after review of plaintiffs' Third Amended Original Petition, would *not* grant leave to file it,

5

and that "it is therefore ORDERED, ADJUDGED and DECREED that this case is DISMISSED" and "Costs are taxed to Plaintiffs."[6]

On December 11, 2003, defendants wrote the court and requested certain clarifying formal changes in the December 8 judgment (enclosing a suggested form of judgment) and a hearing was held thereon on December 19, 2003. At the beginning of the December 19 hearing, plaintiffs' counsel announced that plaintiffs were taking a non-suit "as to everything," "all causes of action," and advised that the day before he had filed the instant suit in federal court. Defendants objected on the basis that the court had already disposed of the case by its December 8 order. The court then signed the defendants' suggested corrected final judgment form, stating that it was doing so because "I believe this corrected final judgment clearly sets out the Court's prior rulings." The court stated that it added the time of signing (9:45 a.m.) to the corrected final judgment so it would be clear that this was *after* the plaintiffs' non-suit earlier that same day. The December 19 "Corrected Final Judgment" concludes by stating that it is:

---

[6]The entire text is as follows:
"CAME ON TO BE HEARD Defendant's Summary Judgment in the above styled and numbered cause, wherein WILLIAM T. NORRIS, ET AL. are Plaintiffs and HOUSTON CHRONICLE PUBLISHING COMPANY is Defendant. The Court, having previously sustained Defendant's Special Exceptions and Summary Judgment and having granted Plaintiffs leave to amend, set December 8, 2003 as the deadline for the Plaintiffs to replead. After review of Plaintiffs' Third Amended Petition, the Court will not grant leave to amend to add a new cause of action and dismisses this claim. It is therefore
ORDERED, ADJUDGED, and DECREED that this case is DISMISSED.
Costs are taxed to Plaintiffs.
SIGNED this 8th day of December, 2003."

"ORDERED, ADJUDGED AND DECREED that this case be and is hereby FINALLY DISMISSED with prejudice to the refiling of same. All relief not expressly granted in denied. The Court's previous orders of November 7 and December 8 are brought forward, merged herein and made final. THIS IS A FINAL JUDGMENT, which disposes of all claims and all parties before the Court."[7]

---

[7]The judgment is entitled "Corrected Final Judgment" and its full text is as follows:

"CAME ON TO BE HEARD in regular order the motion of Defendant Houston Chronicle Publishing Company for summary judgment on all claims, pursuant to TEX. R. CIV. P. 166a [sic]. Due notice having been given, the Court on November 7, 2003, considered the motion, the response, all exhibits and affidavits filed in connection therewith, the pleadings and argument of counsel, and all other matters properly before it. After due consideration, the Court is of the opinion and finds that Defendant's Motion for Summary Judgment is well taken and should be granted, that there is no genuine issue as to any material fact, and that Defendant Houston Chronicle Publishing Company is entitled to judgment as a matter of law. It is accordingly

ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Summary Judgment be and is hereby GRANTED in all respects. It is further

ORDERED, ADJUDGED AND DECREED that Plaintiffs take nothing of and from Defendant, and that Defendant is entitled to recover all costs taxed herein, for which let execution issue if not timely paid.

After hearing on the Motion for Summary Judgment on November 7, 2003, the Court entertained Plaintiffs' request for leave to amend their petition, and set a subsequent hearing for December 8, 2003. All parties appeared in court on December 8, and Plaintiffs presented their proposed third amended petition, which the Court construed as a motion by Plaintiffs for leave to amend and replead. After due consideration of same, the Court DENIES leave to amend the petition to add new causes of action, and orders that this case be and is hereby finally DISMISSED WITH PREJUDICE. It is accordingly

ORDERED, ADJUDGED AND DECREED that this case be and is hereby FINALLY DISMISSED with prejudice to the refiling of same. All relief not expressly granted is denied. The Court's previous orders of November 7 and December 8 are brought forward, merged herein and made final. THIS IS A FINAL JUDGMENT, which disposes of all claims and all parties before the Court.

SIGNED at Houston, Texas this 19th day of December, 2003. at 9:45."

7

The state district court's orders of December 8 and December 19, 2003, have never been set aside, by appeal, mandamus, bill of review, or otherwise.[8]

Meanwhile, on December 18, 2003, the original plaintiffs joined by Stovall, a distributor in the same position and with the same claims as the original plaintiffs, filed the instant case in federal district court below, the case that is now before us on this appeal. The claims in the complaint here are essentially the same as those filed in the state court case, with the addition of essentially the same state and federal antitrust claims as those the original plaintiffs attempted to add in their third amended state court petition.

In the present case, the district court below on September 29, 2004, granted Hearst's Rule 12(b)(6) motion to dismiss. The district court determined that all claims of the original plaintiffs were barred by res judicata and collateral estoppel due to the previous state court judgment. The district court also dismissed the antitrust claims of all six plaintiffs on the grounds that they failed to allege antitrust injury and lacked antitrust standing. The September 29, 2004 memorandum opinion essentially disposed of all claims and parties except for Stoval's state law

---

[8]The state court plaintiffs on January 16, 2004, filed a motion for new trial in the state suit, requesting that, in light of the federal suit and to avoid unnecessary duplication, a new trial be granted conditional on "plaintiffs' non-suit[ing] the balance of their case within 30 days of the granting of the new trial." The state court denied the motion March 1, 2004. The state court plaintiffs gave notice of appeal to the state Fourteenth Court of Appeals, but that Court ultimately dismissed the appeal as untimely on June 10, 2004.

claims which were subsequently dismissed without prejudice on his motion.

## II.  DISCUSSION

On appeal, the original plaintiffs argue that the district court erroneously concluded that res judicata and collateral estoppel barred all the claims of the original plaintiffs because they effectively nonsuited all their claims in state court. They assert that Texas law provides that a nonsuit prior to final judgment relieves the state court of jurisdiction over any causes of action, pleaded or not, and thereby prevents application of res judicata or collateral estoppel in this case. They do not, however, challenge the res judicata dismissal of their *Sabine Pilot* claim. Plaintiffs further argue that the allegations set forth in the complaint are sufficient to allege antitrust violations, damages and standing.

Hearst argues that all claims of the original plaintiffs are barred by res judicata and collateral estoppel. Hearst further contends that the original plaintiffs' effort to nonsuit the non-antitrust claims in state court cannot avoid the preclusive effects of the state court suit since the purported nonsuit came after the state court had heard and granted Hearst's summary judgment motion and dismissed the suit. Hearst also claims that the original plaintiffs could not have nonsuited their antitrust claims because those claims were never actually filed in state court. Therefore,

9

according to Hearst, the original plaintiffs' antitrust claims are precluded because they are based on the same subject matter and could have been litigated in the prior case.

Hearst also argues that all the plaintiffs lack standing to bring the antitrust claims. Hearst claims that the alleged conduct does not amount to anticompetitive behavior and the plaintiffs are neither consumers nor competitors in a relevant market. Furthermore, Hearst contends the distributors can neither plead nor prove any direct causal link between the claimed injuries and the alleged wrongful antitrust act, and that the alleged injuries are of a personal nature rather than anti-competitive, and are not the type of injuries the antitrust laws were designed to remedy. Because the anti-trust claims of Stovall (who was not a party to the state court suit and is not subject to res judicata) and those of the original plaintiffs are identical, and we conclude that the district court properly dismissed all those antitrust claims on the above stated grounds, we do not address whether the antitrust claims of the original plaintiffs are also barred by res judicata or collateral estoppel.

A. *Res judicata dismissal of state law contract and Sabine Pilot claims*.

As the parties and the district court have recognized, the preclusive effect of prior state court proceedings on federal proceedings is determined by the treatment those state court proceedings would receive in the courts of the state – here, Texas

10

– in which those prior proceedings were held. *Production Supply Co., Inc. v. Fry Steel Inc.*, 74 F.3d 76, 78 (5th Cir. 1996). We understand the Texas rule on res judicata to be that stated in *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996), as follows:

> "Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action. . . . It requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action."

The original plaintiffs do not contend on appeal that, at least respecting their state law contract and *Sabine Pilot* claims, the above identified second and third res judicata elements are unsatisfied. Rather, they contend that they took a nonsuit in the state court case on December 19, 2003, before the judgment of that date (see note 7 supra) was pronounced or entered, and that hence the state court proceedings do not give rise to res judicata or collateral estoppel.[9]

---

[9] That is appellants' sole argument in this connection. They make no contention (and apparently did not contend below) that a Rule 12(b)(6) motion is an improper vehicle to support a res judicata (or collateral estoppel) dismissal. While we have said that "generally a res judicata contention cannot be brought in a motion to dismiss," we have likewise held that any such contention is waived by failure to properly raise it on appeal. *See Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005). *See also Moch v. East Baton Rouge Parish School*, 548 F.2d 594, 596 n.3 (5th Cir. 1977). *But see* Wright & Miller, Federal Practice and Procedure: Civil 3rd § 1357 at 721, 728 (". . . affirmative defenses that have been considered on a motion to dismiss under Rule 12(b)(6) include . . . the barring effect of res judicata and related preclusion principles", citing numerous decisions). And, it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record. *See Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).

11

It is recognized that under Texas law "[s]ubject to certain conditions, a plaintiff who takes a nonsuit is not precluded from filing a subsequent suit seeking the same relief," *Aetna Casualty & Surety Co. v. Specia*, 849 S.W.2d 805, 806 (Tex. 1993), and "a nonsuit may have the effect of vitiating earlier interlocutory orders." *Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 854 (Tex. 1995). However, "[o]nce a judge announces a decision that adjudicates a claim, that claim is no longer subject to the plaintiff's right to nonsuit," and that applies to a judge's announcement of decision on a partial summary judgment motion which seeks relief on less than all of the plaintiff's pending claims. *Id*. at 855.[10]

As noted, the state court on November 7 heard argument on the defendants' summary judgment motion, which sought judgment on *all* claims alleged in the original plaintiffs' only live pleading, their second amended original petition. The court at that hearing "granted summary judgment for the *Sabine Pilot* cause of action" because plaintiffs were independent contractors rather than at will

_____

[10]*See also, e.g., Collins v. Waldo*, 291 S.W.2d 360, 361-62 (Tex. Civ. App., Eastland, 1956, n.w.h.) (plaintiff sued the Waldos and an insurance company; the Waldos on June 23 filed a mtoion for summary judgment, the court had a hearing on the motion on July 29 and took it under advisement, on August 4 the court wrote all counsel a letter advising that the motion for summary judgment would be granted and "requested the preparation of a form of judgment for entry," on August 17 plaintiff filed a motion for nonsuit without prejudice as to all defendants and that motion was heard August 23 and it was then granted as to the insurance company but denied as to the Waldos, as to whom the court rendered judgment sustaining their motion for summary judgment and rendering judgment that plaintiffs take nothing against them; on plaintiff's appeal, the Eastland Court of Civil Appeals held this was proper, rejecting plaintiff's claim that she was entitled to a nonsuit of her claims against the Waldos).

12

employees, ruled that no legally valid contract claim had been adequately alleged, and gave the plaintiffs until December 8, 2003, to replead, stating "if you [plaintiffs ]have any other causes of action to plead for breach of contract, you should make those pleadings.  Otherwise, I will dismiss the case and enter a judgment on the summary judgment dismissing the case."  At the December 8, 2003, hearing, plaintiffs tendered their third amended original petition, which for the first time added Texas and federal antitrust claims (and otherwise was largely the same as the second amended original petition), and the court denied leave to file it. The defense then asked if "the court intended to enter a final appealable order at this time" and the court replied "Just did. The Clerk will give everybody a copy," referring to the order of December 8, 2003 (see note 6 supra), signed by the judge and filed that date.  This order recites that the court had "sustained Defendant's Special Exceptions and Summary Judgment," granted plaintiffs leave to amend with a December 8, 2003 deadline, reviewed plaintiffs' tendered third amended petition and denied leave to file it, and that " it is therefore . . . ORDERED, ADJUDGED, and DECREED that this case is DISMISSED" and "Costs are taxed to Plaintiffs."  We hold that the state court rendered final judgment on the merits on December 8, 2003, and hence the original plaintiffs' attempted nonsuit on December 19, 2003, was not effective with respect to the claims disposed of by the December 8, 2003 order.  This follows from *Hyundai* and *Collins v. Waldo*, as

13

well as other authorities. *See also, e.g., Peek v. Berry*, 184 S.W.2d 272, 274 (Tex. 1945) ("where the trial court sustains exceptions which leaves no cause of action pending, and the plaintiff refuses to amend, a final judgment of dismissal for this reason is res adjudicata of another suit upon the same cause of action"); *Jones v. City of Uvalde*, 144 S.W.2d 932 (Tex. Civ. App. San Antonio 1940, writ ref'd) (same).[11]

We do not address whether res judicata bars any of appellants' state or federal anti-trust claims. We reject appellants' complaints as to the district court's holding that all of their other claims were barred by res judicata.[12]

---

[11]And *see, e.g., Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 204 (Tex. 2001) ("granting more relief than the movant is entitled to makes the order reversible, but not interlocutory," citing *Young v. Hodde*, 682 S.W.2d 236, 237 (Tex. 1984), 205 (the finality requirement for appeal that there "be some clear indication that the trial court intended the order to completely dispose of the entire case" is satisfied by "[l]anguage . . . that the case is dismissed . . . if there are no other claims by other parties"); *Young*, 682 S.W.2d at 237 ("erroneous rendition of a final judgment is not fundamental error" and is not "jurisdictional in nature").

Moreover, the original plaintiffs do not contend that the December 19, 2003 judgment would not have been res judicata if it had been entered before – rather than immediately after – the nonsuit had been orally requested earlier that morning. Thus, it is significant that the state court, in open court at the December 19, 2003, hearing, stated that she was signing the December 19, 2003 judgment because "this corrected final judgment clearly sets out the Court's prior rulings." This can only mean that the state court intended and understood its December 8, 2003 order to constitute a final judgment on the merits as to the entire case and all claims therein.

[12]We merely assume, *arguendo only*, that the December 19, 2003 judgment could not, *of itself*, support a res judicata determination since it was entered *after* the nonsuit announcement earlier that day. However, we note the December 19, 2003 judgment has never been set aside, whether by appeal, mandamus, bill of review or otherwise. In essence, the argument of the original plaintiffs constitutes a collateral attack on the December 19, 2003 judgment, and such an attack can succeed only if the December 19 judgment was wholly void, not merely voidable or erroneous. *See* 48 Tex. Jur. 3d, Judgments § 356 ("where a judgment is collaterally attacked, the party attacking it bears the burden of proving the judgment void . . . It must also be proved that, for the reason claimed, the judgment was rendered without jurisdiction."); § 357 (such "must be established

14

B.  *Antitrust claims; all plaintiffs lack antitrust injury and standing.*

The complaint invokes "the Sherman Act (15 U.S.C. § 1 & § 2) the Clayton Act (15 U.S.C. § 15(a)) and the Robinson Patman Act (15 U.S.C. § 13(a))."[13]

The complaint alleges that the plaintiffs, until their here complained of termination "in the late 1990s", were and for many years had been, pursuant to contracts with Hearst, distributors of the *Houston Chronicle*, a daily newspaper of general circulation in the greater Houston, metropolitan area, owned by Hearst. Plaintiffs further alleged that in 1995 the Justice Department

---

with manifest certainty"). We need not decide whether the original plaintiffs have made such a showing of voidness with respect to the December 19, 2003 judgment.

[13]The Clayton Act, 15 U.S.C. § 15(a), provides a private damage action (treble damages) for any person "injured in his business or property by reason of anything forbidden in the antitrust laws."
The Robinson Patman Act makes it unlawful under certain circumstances "to discriminate in price between different purchasers of commodities of like grade and quantity" (15 U.S.C. § 13(a)). Other provisions of the Robinson Patman Act also in general denounce similar discrimination between purchasers of goods in respect to commissions or allowances regarding such purchases, or in services rendered in respect thereto, or in the payment for or furnishing of services or facilities in respect there (15 U.S.C. §§ 13(c), (d) & (e)). No such price (or commission or services or facilities) discrimination is alleged in the complaint and appellants make no Robinson Patman Act argument on appeal, so we do not further consider or address it.
The Complaint also invokes "the Texas Free Enterprise and Antitrust Act of 1983 (15 Tex. Bus. & Comm. Code § 15.01, § 15.05(a), (b))." As stated in *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. App. Ft. Worth 1994, writ denied), Texas courts construe this act "in harmony with federal judicial interpretations of comparable federal antitrust statutes", citing Tex. Bus. & Comm. Code § 15.04, which in part provides that ". . . this Act . . . shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes. . . ." This includes following federal judicial interpretations requiring and identifying antitrust injury and antitrust standing. *Scott* at 950. Nor do appellants urge on appeal any particular Texas law rule distinct or departing from federal judicial interpretations of federal antitrust statutes. Accordingly, we do not further notice the Texas law in this respect.

15

approved Hearst's acquisition of the *Houston Post*, the only competitor daily newspaper in the greater Houston metropolitan area, and that – at least after Hearst subsequently closed the *Post* – the *Chronicle* became a monopoly in the "relevant market," namely "the greater Houston metropolitan area." Though the relevant product is not expressly identified as such, it is obviously the *Chronicle* and only the *Chronicle*. The only consumers or users of that product identifiable from the Complaint are the *Chronicle's* subscribers (or readers) and those who advertise in it. There is no allegation of any harm – or increased price or cost to – subscribers (or readers).

The *only* harm or injury to plaintiffs alleged in the complaint is that Hearst terminated them as distributors of the *Chronicle* *because* they refused (or complained of) its requests that they certify to the Audit Bureau of Circulations falsely inflated numbers of "Home Delivery Subscribers," it being alleged that this was desired by Hearst to increase the *Chronicle's* advertising sales and revenue in that "Advertisers rely on Defendant's claims of paid subscribers in deciding whether to buy space in Defendant's newspapers."[14]

---

[14]Plaintiffs also allege a confused melange of actions on the part of Hearst which appear to have no relationship whatever to plaintiffs or their claimed injury or the relevant market (alleged to be metropolitan Houston), such as circa 1970 "arm-twisting" by Hearst of President Nixon to support the "Newspaper Preservation Act" which passed in that year, or activities by Hearst in Seattle or San Francisco or other places clearly well removed from the alleged relevant market here, in none of which other areas is it alleged that any plaintiff ever had any actual, potential, attempted or intended relationship.

16

Our review of the district court's determination of a Rule 12(b)(6) motion is *de novo*. For purposes of ruling on such a motion, the court "must assume that the . . [plaintiff] can prove the facts alleged in its . . . complaint. It is not, however, proper to assume that the . . . [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Assoc. Gen. Contractors of Cal. v. Cal. St. Council*, 103 S.Ct. 897, 902 (1983). And, on such a motion, courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 106 S.Ct. 2932, 2944 (1986). A naked allegation of conspiracy or agreement, without more specific factual allegations, is not to be accepted as sufficient to state a claim under Section 1 of the Sherman Act. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1966 (2007). To withstand a Rule 12(b)(6) motion, the complaint must allege "more than labels and conclusions," "a formulaic recitation of the elements of a cause of action will not do" and "[F]actual allegations must be enough to raise a right to relief above the speculative level . . ." *Id*. at 1965.[15]

---

[15]Appellants' brief appears to assume that they may expand their complaint on appeal because the district court denied them leave to amend. However, appellants' brief has no point of error complaining of the denial of leave to amend, it contains no argument that the trial court erred in denying leave to amend, and it does not reference the content of any proposed amended pleading. Moreover, examination of the record reveals that over a month *after* appellants had filed their response to appellees' motion to dismiss, appellants filed a motion to add an additional party plaintiff (another former *Chronicle* distributor, stated to be similarly situated to the other six) and a proposed amended complaint which was no different than the existing complaint except only for the addition of the name of the proposed new plaintiff. Appellees opposed

17

The Supreme Court has long held that suits under section 4 of the Clayton Action (15 U.S.C. § 15(a)) for violation of either Section 1 or Section 2 of the Sherman Act require not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing.[16] Thus, in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 97 S.Ct. 690, 697 (1977), the Court, observing that "[t]he antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*'", went on to state that a plaintiff "must prove more than injury causally linked to" an antitrust violation, namely:

> "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

the motion to add the additional party plaintiff, and the district court denied it. This proposed amendment makes no changes in any allegations except party names. On September 29, 2004, the district court filed its opinion and entered its Rule 54(b) judgment dismissing all claims of the original plaintiffs; on October 12, 2004, appellants (other than Stoval) filed their motion for new trial (which states no grounds); on December 21, 2004, appellants moved for leave to file an amended complaint but neither tendered any such complaint nor stated anything about what sort of new allegations were contemplated beyond saying they would "plead with more specificity as to facts and explanation of their components and theories relating to monopoly and antitrust claim;" requesting 45 days *after* the court's ruling on the motion for new trial in which to do so. Appellees opposed the motion for new trial and the motion to file an amended complaint. The district court ultimately denied both motions in July 2005. No proposed amended complaint has ever been tendered. In these circumstances, there is no basis for us to treat appellants any differently than if they had never sought to amend the complaint.

[16]*See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 110 S.Ct. 1884, 1893 (1990) (antitrust injury requirement applicable where underlying violation is per se violation of Section 1 of the Sherman Act); *Doctor's Hosp. of Jefferson v. S.E. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) ("Antitrust injury must be established for the plaintiff to have standing under section 1 or section 2 of the Sherman Act."); *Walker v. U-Haul Co. of Mississippi*, 747 F.2d 1011, 1014-15 (5th Cir. 1984); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 303 (5th Cir. 1984).

anticompetitive acts made possible by the violation."
*Id*. at 697.

*Brunswick* also observed that although the plaintiffs' "loss occurred 'by reason of' the unlawful acquisition, it did not occur 'by reason of' that which made the acquisition unlawful" and hence did not constitute antitrust injury. *Id*. And, in *Assoc. Gen. Contractors* the court reaffirmed *Brunswick*, in holding that union's antitrust complaint was properly dismissed under Rule 12(b)(6) for lack of antitrust injury, despite adequate allegation of "a causal connection between an antitrust violation and harm to the Union and . . . that the defendants intended to cause that harm." *Id*., 103 S.Ct. at 908. The Court also observed that "the Union was neither a consumer nor a competitor in the market in which trade was restrained," *id*. at 909, and that the existence of businesses directly injured by the same alleged antitrust violations "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" weighed against the Union's antitrust standing. *Id*. at 909. As we summarized in *McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988):

> "Even a plaintiff injured in his business or property must, in order to sue for damages, show 'antitrust injury,' that is, 'injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.' Finally, even if the plaintiff meets these requirements, the court must consider whether he is a 'proper plaintiff' to sue for damages, examining such facts as (1) whether the plaintiff's injuries or their causal link to the

19

defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." (footnotes omitted)

*See also Atlantic Richfield Co.*, 110 S.Ct. at 1892 ("Antitrust injury does not arise for purposes of § 4 of the Clayton Act . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct"); *Hughes v. Tobacco Institute Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.")

Plaintiffs were not consumers of the *Chronicle* or its advertising services, and they were not producers or sellers of competing publications or media. Hearst's conduct in causing, or attempting to cause, falsely enhanced *Chronicle* subscriber numbers to be furnished to the Audit Bureau in order to increase sales of, and/or rates charged for, advertising in the *Chronicle*, to the extent violative of Section 1[17] and/or Section 2 of the Sherman Act, would be so *because* such conduct would tend to cause injury *either*

---

[17]We note that the complaint does not appear to allege a conspiracy and may well be insufficient in that respect to state a Section 1 claim. *See, e.g., Johnson v. Hospital Corporation of America*, 95 F.3d 383, 392 (5th Cir. 1995) ("Section one applies only to concerted action. . ."); *Dillard v. Merrill Lylnch, Pierce, Fenner Inc.*, 961 F.2d 1148, 1158 (5th Cir. 1992) ("In order to state a claim for a violation of Section 1, a plaintiff must allege (1) the existence of a conspiracy . . ."). A manufacturer's unilateral termination of a distributor does not violate Section 1. *Doctor's Hosp. of Jefferson* at 307. However, we assume, arguendo, that the complaint adequately alleges a Sherman Act violation in this respect.

to those desiring to use the *Chronicle* to advertise in, the consumers (of the paper's advertising services) – or to other media selling advertising, the paper's competitors (in the sale of advertising). Moreover, unlike plaintiffs, such parties are the only ones directly injured by the harm to competition caused or posed by the asserted antitrust violations and they are hence the appropriate parties to sue for any such violation. Plaintiffs are neither consumers (buyers of advertising, or users of advertising such as subscribers) nor competitors (sellers of advertising) in the relevant market. Plaintiffs have not suffered antitrust injury. *See also, e.g., Mathias v. Daily News, LP*, 152 F.Supp. 2d 465, 479 (S.D.N.Y. 2001); *Volmar Distrib. v. New York Post Co.*, 825 F.Supp. 1153,1158 (S.D.N.Y. 1993).

Plaintiffs contend that they have sustained antitrust injury *because* they were terminated due to their refusal to participate in the antitrust violations. We have rejected that approach. *See, e.g., Feeney v. Chamberlain Mfg. Co.*, 831 F.2d 93 (5th Cir. 1987) (commission salesman terminated by defendant for protesting defendant's giving one large customer, whom plaintiff did not service, greater discounts than other of its customers, including those serviced by plaintiff, in violation of the Robinson Patman Act, 15 U.S.C. § 13(a), has not suffered antitrust injury, even though the result of the conduct was fewer sales to customers plaintiff serviced and hence fewer commissions to him). Other

21

courts are in accord. *See, e.g., Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.3d 92 (3d Cir. 1986) (plaintiff, distributor for defendant manufacturer, terminated by defendant for protesting and refusing to fabricate explanation for, special discounts given by manufacturer to one large customer in violation of the Robinson Patman Act; complaint properly dismissed on Rule 12(b)(6) motion for lack of antitrust injury); *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir. 1982).

Plaintiffs' reliance on *Blue Shield of Virginia v. McCready*, 102 S.Ct. 2540 (1982), is plainly misplaced. There McCready, who subscribed to her employer's Blue Shield of Virginia prepaid group health plan, was treated by a psychologist but Blue Shield declined to pay any of the costs thereof (and so McCready had to pay) because its plan reimbursed subscribers only for psychotherapy services provided by psychiatrists but not for those provided by psychologists. McCready sued Blue Shield under Section 4 of the Clayton Act alleging that the Blue Shield plan's provision in question was the result of a conspiracy and agreement between Blue Shield and the Neuropsychiatric Society of Virginia (psychiatrists) contrary to Section 1 of the Sherman Act. The Court held that the district court erred in dismissing McCready's suit for lack of antitrust injury. The Court noted that McCready was an appropriate plaintiff:

> "McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her. Her psychologist can link no claim of injury to himself

22

arising from his treatment of McCready; he has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services. And whatever the adverse effect of Blue Shield's action on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits." *Id.* at 2548.

It went on to hold that:

"As a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was 'within that area of the economy . . . endangered by [that] breakdown of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." *Id.* at 2549. (citation omitted).

This, we believe, is the key to *McCready*. In *Assoc. Gen. Contractors*, the Court distinguished *McCready*, noting that "the Sherman Act was enacted to assure customers the benefits of price competition" and that "McCready . . . was a consumer of psychotherapeutic services . . . injured by defendants' conspiracy to restrain competition in the market for such services," *id.*, 103 S.Ct. at 908, while "[in] this case, however, the [plaintiff] Union was neither a consumer nor a competitor in the market in which trade was restrained." *Id.*, 103 S.Ct. at 909. That is likewise the present situation as plaintiffs here are neither consumers nor competitors in the market attempted to be restrained. Other courts have similarly construed *McCready*.[18]

_____

[18]*See, e.g., SAS of Puerto Rico v. Puerto Rico Telephone Co.*, 48 F.3d 39, 48 (1st Cir. 1995), reading *McCready* "as a case in which the plaintiff was a purchaser in the very market distorted by the antitrust violation." With respect to the "inextricably intertwined" language in *McCready*, the *SAS* Court noted that:

23

Finally, antitrust standing is not achieved by the bare allegation, untied to anything else, that Hearst "has integrated vertically into the distribution of its paper in the relevant market" and "has become a competitor of its distributors." There is no allegation suggesting that this had anything to do with, or even came about before, plaintiffs were, as alleged in the complaint, "either terminated or resigned because Plaintiffs either refused to participate in or complained about" the demanded false overstating of paid subscribers in their reports to the Audit Bureau. As previously observed, no facts are alleged tending to indicate any Robinson Patman Act violation and no such violation has been argued on appeal (see note 13 *supra*). Nor – *apart* from the mentioned allegations concerning falsely inflating the number of paid subscribers in order to enhance advertising revenue (which

". . . such a test would certainly be very hard to square with the longstanding limitations on claims by stockholders, employees and even indirect purchasers. Nothing in *McCready* suggests that it intended to overrule those limitations even though it would be very easy to describe such injuries as inextricably intertwined in the ordinary suggestive sense of the phrase.

In all events, the Supreme Court simply reinterpreted the phrase as a legal conclusion in *Associated General Contractors*, saying (after a reference to the phrase): 'In this case [*Associated General Contractors*] however, the Union was neither a consumer nor a competitor in the [restrained] market. . . .' 459 U.S. at 539, 103 S.Ct. at 909. It did the same thing more recently in *Atlantic Richfield v. USA Petroleum Co.*, 495 U.S. 328, 345, 110 S.Ct. 1884, 1895, 109 L.Ed.2d 333 (1990) (injury not 'inextricably intertwined' because competitor not injured by 'the *anticompetitive* effects' of the challenged conduct). We do not think that anything more need be said about the matter." *Id*.

See also *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 13 (1st Cir. 1999) (". . . we decline to interpret *McCready* broadly," noting that there "the plaintiff was a consumer in the market directly affected by the antitrust violation" and that the Supreme Court had applied *McCready*'s "inextricably intertwined" language "as a legal conclusion" applicable "to the consumers and competitors").

24

we have already addressed) – is there any allegation that the termination of the plaintiffs had any adverse effect on anyone else, either by increasing the price or decreasing the availability of the *Chronicle* to its subscribers or other readers or by damaging competitors or otherwise. As alleged, the *Chronicle* has a monopoly of the product in question, being the only daily newspaper of general circulation throughout the greater Houston area. For the *Chronicle* to terminate a distributor and itself take over the *Chronicle* distribution previously performed by the terminated distributor is not in these circumstances some separate antitrust violation on account of which the terminated distributor has antitrust injury and antitrust standing. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995).[19] See also, e.g.,

---

[19]In *G.K.A. Beverage*, the court affirmed a Rule 12(b)(6) dismissal of the plaintiffs' distributors' antitrust claims, approving an earlier decision (*A.G.S. Electronics v. B.S.R.*, 460 F.Supp. 707, 710 (S.D.N.Y.), *aff'd*, 591 F.2d 1329 (2d Cir. 1978) (table), holding that where the defendant manufacturer of record players acquired another manufacturer thereof thus monopolizing record player manufacturing, and the defendant acquiring manufacturer then terminated the distributorship the plaintiff had had with the acquired manufacturer, the plaintiff "lacked standing to assert an antitrust claim" because its injuries all flowed from the termination of its distributorship "'rather than any anticompetitive effects of the defendant's acquisition of' [the acquired manufacturer]." *C.K.A. Beverage* goes on to note that in the case before it the plaintiffs were distributors of bottled soft drinks and defendant Honickman was a bottler distributing its own product, and plaintiffs complained, *inter alia*, that Honickman wrongfully achieved a bottling monopoly and "they suffered antitrust injury in the elimination of competition in retail distribution between themselves and Honickman." The Second Circuit concluded this did not amount to antitrust injury, stating:

> "However, the so-called 'distribution monopoly' is derived entirely from Honickman's share of the bottling market. Honickman's 'distribution monopoly' thus involves only his product. Moreover, a vertically structured monopoly can take only one monopoly profit. . . . If, as alleged, appellees successfully conspired to monopolize soft drink bottling in the New York area, they could reap no additional gain from monopolizing the retail distribution of soft drinks. . . . Once having achieved the alleged bottling monopoly,

25

*RSA Media Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 14 (1st Cir. 2001) ("distributor lacks antitrust standing because it cannot have suffered antitrust injury"); *Serpa*, 199 F.3d at 14 (same).[20]

We hold that the district court properly dismissed the antitrust claims for lack of antitrust injury and antitrust standing.

## III.  CONCLUSION

The judgment of the district court is

AFFIRMED.

---

therefore, appellees' sole incentive is to select the cheapest method of distribution."

[20]We further note the Supreme Court's frequent reminders that "the primary purpose of the antitrust laws is to protect interbrand competition." *State Oil Co. v. Khan*, 118 S.Ct. 275, 282 (1997).  Essentially the same statements appear in *Leegin Creative Leather Products v. PSKS, Inc.*, 127 S.Ct. 2705, 2715 (2007); *Business Electronics Corp. v. Sharp Electronics*, 108 S.Ct. 1515, 1521 (1988); *and Continental TV Inc. v. GTE Sylvania Inc.*, 97 S.Ct. 2548, 2558 n.19 (1977).