# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2026

Lyle W. Cayce
Clerk

No. 24-10995

Endure Industries, Incorporated,

*Plaintiff—Appellant*,

*versus*

Vizient Incorporated, *a Delaware corporation*;
Vizient Supply L.L.C., *a Delaware limited liability company*;
Vizient Source L.L.C., *a Delaware limited liability company*;
Provista Incorporated, *a Delaware corporation*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-3190

Before Smith, Stewart, and Ramirez, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

This appeal is about market definition under antitrust law. With the exception of certain *per se* violations such as horizontal agreements on market division or price fixing, antitrust plaintiffs must always establish market definition to show injury. The district court resolved market definition on summary judgment for the defendants, holding that the plaintiff had identified no genuine dispute of material fact, or equivalently that no reasonable jury could

No. 22-20321

return a favorable verdict with respect to plaintiff's two proposed markets. Finding no error, we affirm.

I.

A.

Endure Industries, Inc., is a seller of Disposable Medical Supplies ("DMS") such as bandages, medical tape, and syringes, which are used by healthcare providers such as hospitals, doctors' offices, schools, and prisons. DMS are used in great volume by General Acute Care Centers ("GACs"), which are healthcare facilities that range from small, critical-access hospitals to large academic medical centers. GACs are equipped and staffed to provide short-term, inpatient medical and surgical services, as distinguished from intensive care facilities, specialized surgical centers, and nursing homes.

Vizient, Inc., Vizient Source, LLC, Vizient Supply, LLC, and Provista, Inc. (collectively, "Vizient"), are organized around parent company Vizient, which is the largest Group Purchasing Organization ("GPO") in the country, controlling 53% of market share. Vizient is also the largest GPO focused on GACs, serving over 50% of acute-care health systems and 97% of academic medical centers. GPOs are contracting agents that pool demand from their member healthcare providers, including GACs, to reduce administrative burden and negotiate lower pricing from suppliers.

Vizient offers DMS to its members in thirteen different categories such as "General Surgery" or "Family Care" product bundles, each of which contains some number of individual stock-keeping units ("SKUs") or inventory items. Members who buy enough DMS within a bundle receive rebates under Vizient's "Impact Standardization Program" ("ISP"). Vizient charges fees to its members called Contract Administrative Fees ("CAFs"), which vary depending on the number of Vizient-brokered contracts the member assumes, and may be prorated down if the member

participates in Vizient's ISP rebate program.

So, like many businesses, Vizient buys wholesale and sells retail. Historically, the GPO market contained twelve national purchasing member organizations in 1997 along with several regional and local GPOs, but today has consolidated to three national GPOs and several local GPOs accounting for 2.5% or less of the market. Vizient is the largest GPO; it captures more than 53% of net patient revenue in the GPO market, and its contract portfolio aggregates more than $140 billion in demand, including at least $7 billion in the GAC market.

Vizient's ISP rebate program is organized into thirteen different product categories such as "Airway Management," "Bowel Management," "General Surgery" and "Family Care" bundles, each containing relevant SKUs. The ISP requires a Vizient Member to project its total annual spending across the SKUs in the bundle (diapers, lactation care, and medical nutrition for example). According to an internal document, this projection "should cover a member's entire spend in the category with all suppliers." The GPO member must then meet 90% compliance for each individual SKU to receive a rebate for that product, as well as 75% overall compliance to receive any rebates across that ISP bundle. Vizient monitors compliance with the category-spend obligations on a quarterly basis.

Endure, after its own fashion, also buys wholesale and sells retail. Endure is a "relabeler" or "repackager," commissioning DMS from manufacturers overseas and then selling directly to health care providers. Such providers would include pooled demand vehicles such as GPOs and the twenty-eight hospitals that participate in Vizient's GPO and rebates program.

When Endure made a bid to join Vizient's GPO as a supplier of medical tape, Vizient rejected that bid in favor of 3M, the well-known maker of

Scotch Tape and many consumer goods. Following that rejection, the spurned Endure brought an antitrust complaint in 2020 against Vizient, alleging monopolization by exclusive dealing with bid-rigging, unilateral refusal to deal, essential facilities monopolization, and vertical rebate agreements in restraint of trade in two proposed markets for medical products. Following a motion to dismiss, failed settlement negotiations, unresolved motions to exclude expert testimony, and the close of discovery, Vizient moved for summary judgment for failure to define any sufficient antitrust market.

## B.

On October 9, 2024, the district court granted the motion for summary judgment in an opinion reasoning that Endure had failed to establish a legally sufficient definition of the relevant market; it entered final judgment for Vizient. Although Vizient had moved for summary judgment on (1) Endure's proposed antitrust markets' legal insufficiency; (2) Vizient's allegedly not actually competing in the proposed markets; and (3) Endure's theories of anticompetitive conduct's failing as a matter of law, the court ruled on only the first issue.

The district court correctly identified that where a plaintiff fails to define a sufficient antitrust market, the court may grant summary judgment on antitrust claims. The court observed that to survive summary judgment, the defined relevant market "must include all commodities reasonably interchangeable by consumers for the same purposes." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010).

The court then analyzed each of Endure's proposed markets proffered by its expert, Loren Smith. First, the court considered the "GPO DMS Market," which Smith defined as encompassing "the sale of DMS through GPO-negotiated and administered contracts to GACs." Second, the court addressed the "Vizient DMS Market," which Smith defined as the sale of

No. 22-20321

DMS to Vizient Member GACs.

On the first market definition, the district court faulted Smith's report for excluding non-GPO DMS sales and conceding that 174 of the 629 GAC hospitals that have left Vizient over the years abandoned the GPO model entirely (27.6%), suggesting that non-GPO sales represented a reasonably interchangeable substitute. The court similarly faulted Smith's report for failing to account for the fact that only 72% of U.S. hospital purchases ran through GPOs, such that Endure had left out nearly 30% of the relevant market, which the court called, "powerful evidence of the alternatives reasonably available to customers."

On the second proposed definition, the district court faulted Smith's report for failing to show lock-in, given that "no allegations suggest [Vizient] members are prevented from buying the supplies they need outside a GPO, joining and purchasing through additional GPOs, or leaving the GPO altogether."

Therefore, Endure had failed to establish a legally sufficient definition of the relevant market.

## C.

On appeal, Endure contends first that its proposed market definitions meet the summary judgment standard of posing a genuine dispute of material fact, and second lodging alternative theories on standing, exclusive dealing, market foreclosure, and Vizient's alleged competition through its "house label" or proprietary brand NovaPlus.

We rule only on the first issue—whether Endure's proposed market definitions satisfy the summary judgment standard—and hold that plaintiffs failed to muster evidence to raise a genuine dispute of material fact as to their preferred market definition of GAC demand routed through GPOs, as well

as the proposed submarket of GAC demand by Vizient members only. We need not address Endure's alternative arguments because the district court did not rule on them in the first instance but decided only the definition of relevant market.

## II.

First, we consider market definition. Next, we apply that definitional discussion to Endure's first proposed market for GPO DMS demand. Finally, we apply it to Endure's second proposed market for Vizient-Member demand.

## A.

The Sherman Act outlaws every contract "in restraint of trade" and attempts to monopolize. 15 U.S.C. §§ 1–2. The Clayton Act adds more specific content to these bans, prohibiting exclusionary acts such as price discrimination, rebates, and exclusive dealing and boycotts "where the effect of such [practice] may be substantially to lessen competition, or to tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. The challenge is that monopolization of any line of commerce involves defining that relevant market within which monopolization injuries may occur.

To support claims under Sections 1 and 2 of the Sherman Act, a plaintiff must "define the relevant market." *Universal Computer Sys., Inc. v. Volvo Cars of N. Am., Inc.*, 207 F.3d 658, *3 (5th Cir. 2000) (per curiam) (unpublished) (table). Restraints evaluated under the Rule of Reason, such as exclusionary dealing and rebates, require courts "to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); P. Areeda & H. Hovenkamp, Fundamentals of Anti-trust Law § 5.02 (4th ed. 2017)). "The relevant market is . . . the area of

6

effective competition," which is the "arena within which significant substitution in consumption or production occurs." *Id.* at 543 (citation modified). A market has two parts: (1) the product market, and (2) the geographic market. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002). The product market defines *which* products compete. The geographic market defines *where* they compete. Here, the proposed geographic market is national, so the disputed question is the product market.

As above, a "proposed product market must include all 'commodities reasonably interchangeable by consumers for the same purpose.'" *PSKS*, 615 F.3d at 417 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Antitrust law fundamentally defines product markets by cross-elasticity of demand, that is, from the demand side.[1]

"The cross-elasticity of demand for substitutes measures consumers' propensity to switch from one product to another, similar product when relative prices change." *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n.3 (5th Cir. 1996). To illustrate, as explained in *du Pont*, 351 U.S. at 400, "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand

---

[1] *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023) ("The outer boundaries of a relevant product market are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it'") (quoting *Brown Shoe*, 370 U.S. at 325 (1962)). Cross Elasticity of Demand is the Percent Change in Quantity of good X/Percent Change in Price of good Y, *see* Adam Hayes, *Cross Price Elasticity: Definition, Formula, and Example*, Investopedia (Aug. 5, 2025). Here, Goods X and Y would be proposed as GPO-GAC sales, and non-GPO GAC sales; etc., for the Vizient Members.

exists between them; that the products compete in the same market."

This court has oriented its market analysis toward consumers' choices: "A proposed product market must include all 'commodities reasonably interchangeable by consumers for the same purposes.'" *PSKS, Inc.* 615 F.3d at 412 (quoting *du Pont*, 351 U.S. at 395). In dismissing an antitrust complaint, this court has stated,

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient.

*Apani*, 300 F.3d at 628. Indeed, the proposed market's "area of effective competition" is essentially equivalent to the "arena within which significant substitution in consumption or production occurs.'" *Am. Express*, 585 U.S. at 543 (internal quotation marks and citation omitted).

Other classical measures of market definition and market power include the Hypothetical Monopolist Test[2] and the *Brown Shoe* qualitative

---

[2] *See 2023 Merger Guidelines* § 4.3.A ("The Hypothetical Monopolist Test. . . evaluates whether a group of products is sufficiently broad to constitute a relevant antitrust market. . . [by] ask[ing] whether a hypothetical profit-maximizing firm. . . likely would undertake at least a small but significant and nontransitory increase in price "SSNIP" or other worsening of terms.") An SSNIP generally looks for a 5% price increase, but it incorporates cross-price elasticity and a diversion ratio (also calculated by cross-price elasticity) into its measure, so it is really a mapping of elasticities onto profit margins. Also, "other worsening of terms" may include reductions in quantity or quality, which redound to price. *See generally Standard Oil Co. v. United States*, 211 U.S. 1, 52 (1911) ("The evils which led to the public outcry against monopolies [in England] and to the final denial of the power to make them [by the King] may be thus summarily stated: (1) The power which the monopoly gave to the one who enjoyed it, to fix the price and thereby injure the public; (2) The power which it engendered of enabling a limitation on production; and (3) The

factors.[3] But the *Brown Shoe* factors are really practical indicia or observable proxies that are probative of cross-elasticity of demand where low cross-elasticity of demand may otherwise be challenging to observe.[4]

Practical factors are helpful for identifying goods that obviously have different demand structures, e.g., Rolex Watches and Timex Watches, or Mercedes versus Toyota sedans. They can also overcome the misleading shortcomings of elasticities where supplementary goods, e.g., tinned sardines and tinned tuna, have overlapping demand curves while being in reality distinct products. Practical indicia also help cut through the "Cellophane Fallacy," where market power is underestimated because prevailing monopoly-pricing encourages spillover into separate goods, such as other wrapping materials, *see generally du Pont,* 351 U.S. at 400–01. That is why the *Brown Shoe* factors invite courts to apply their judgment in distinguishing between goods identified as the same by cross-elasticity of demand and goods thereby

---

danger of deterioration in quality of the monopolized article…."); *United States v. Am. Tobacco Co.*, 211 U.S. 106, 187 (1911) ("the [tobacco] combination. . . . might inflict infinite injury upon the public by leading to a stoppage of supply and a great enhancement of prices").

[3] 370 U.S. at 325 ("Within this broad market, well-defined subdivisions may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as [i] industry or public recognition of the submarket as a separate economic entity, [ii] the product's peculiar characteristics and uses, [iii] unique production facilities, [iv] distinct customers, [v] distinct prices, [vi] sensitivity to price changes, and [vii] specialized vendors.").

[4] *See 2023 Merger Guidelines* at §4.3 ("Market Definition") (citing *Brown Shoe*, 370 U.S. at 325; *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia to evaluate relevant product market that included, based on the unique facts of the industry, those distributors who "could counteract monopolistic restrictions by releasing their own supplies").

distinguished.[5]

The *Brown Shoe* indicia also provide the basic doctrine for distinguishing among wider markets and submarkets. "Though the 'outer boundaries of a product market'" are determined by the framework above, "there may be 'within [a] broad market, well defined submarkets . . . which, in themselves, constitute product markets for antitrust purposes." *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964) (quoting *Brown Shoe*, 370 U.S. at 325). "'The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir. 1977) (quoting *Brown Shoe*, 370 U.S. at 325).

"However, 'a submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions.'" *Worldwide Basketball and Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) (quoting *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983)). "Although a recognized submarket doctrine exists, such markets must exist within broader economic markets. And the requirements for pleading a submarket are no different from those for pleading a relevant broader market." *PSKS*, 615 F.3d at 418 (5th Cir. 2010) (citation omitted).

---

[5] *See Brown Shoe*, 370 U.S. at 294 (pointing out that "the definition of the relevant market" must "'correspond to the commercial realities' of the industry"); *accord Am. Express*, 585 U.S. at 544 ("courts should 'combine' different products or services into 'a single market' when 'that combination reflects commercial realities.'") (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).

No. 22-20321

Therefore, they are fundamentally the same phenomenon, such that the "submarkets" language may be misleading, as distinguished from wider or narrower markets characterized by demand structure.

Within submarkets, we note that single-branded markets could exist as a matter of demand, but they trigger heightened practical concerns. "[I]n rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes." *PSKS*, 615 F.3d at 418. We narrowed that possibility to situations where "structural barrier[s]" cause consumers to be "'locked in' to a specific brand by the nature of the product." *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481–82 (1992)). Indeed, "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984).

Finally, another approach "defines a product market as a 'cluster of services' insulated from competition as a result of their distinctiveness, cost advantages, and settled consumer preference." Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 ANTITRUST L.J. 129, 157 (2007). Where the competitive conditions for multiple relevant markets are reasonably similar, it may be analytically convenient to aggregate the products in these markets into a "cluster market," even though not all products in the cluster are substitutes.[6] All the same, the plaintiff bears the burden of

---

[6] *2023 Merger Guidelines*, § 4.3.D.4.; *see also United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) ("the relevant product market 'within which the competitive effect of the merger is to be judged' is the 'business of commercial banking . . . and the cluster of products and services denoted thereby"); *U.S. v. Rockford Mem'l Corp.,* 898 F.2d 1278, 1284 (7th Cir. 1990) (Posner, J.) (clustering markets for acute care hospitals); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565–66 (6th Cir. 2014) (same).

11

establishing a legally sufficient market. *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir. 1985) (citing *du Pont*, 351 U.S. at 381).

B.

We apply the foregoing principles to Endure's appeal of the summary judgment on its first proposed definition of "The GPO Market," which Endure pleaded as encompassing the "market for the marketing, supply, and distribution of disposable medical supplies by means of GPOs to acute-care hospitals and academic medical centers." On reasonable interchangeability, Endure claimed that "commercial realities" in the arena of disposable medical supplies make it so that "there are practically no interchangeable substitutes for acute care and academic hospitals to [disposable medical supplies], except through GPOs." Endure also claimed, "[b]ecause of internal polices and additional services offered by GPOs, acute-care hospital customers . . . do not view other methods of purchasing disposable medical supplies to be reasonable substitutes." As for price, Endure claimed that "prices of disposable medical supplies are not meaningfully constrained by the price of alternative distribution methods."

At the summary judgment stage, Vizient posited that the GPO Market was legally insufficient for two reasons. First, because, as defined by Endure and its expert, Smith, the market definition "fails to include all reasonably interchangeable substitutes for the same of [disposable medical supplies]" by excluding "sales through non-GPO channels (e.g., sales direct from suppliers." Second, because, as defined by Endure and its expert, the GPO Market is "limited to one kind of customer—[general acute care hospitals] and thus excludes all other healthcare facilities and non-healthcare customers that purchase the same products."

Endure countered that the *Brown Shoe* factors favor the proposed GPO Market. Principally, for the "distinct customer and prices analysis,"

Endure claimed that "Dr. Smith shows that nearly all [general acute care] hospitals use a GPO to purchase from suppliers, and when hospitals switch from a GPO, they most often switch to another GPO supplier." Endure also relied on Smith's report as to no reasonable alternatives, citing "significantly higher transaction costs" and using the same material to argue for specialized vendor and hypothetical monopolist status. As for the qualitative *Brown Shoe* factors, Endure claimed that "the healthcare industry recognizes national GPOs as distinct sales channels" and Vizient "sees itself" as a competitor of other national GPOs.

The plaintiff gets to set the initial terms of engagement on market definition, *Shah*, 985 F.2d at 453–54, but the *Brown Shoe* factors and expert economics testimony are probative of the underlying elasticities. Smith's declaration includes a figure, considered closely by the district court, showing that of the 629 GAC hospitals that have switched from Vizient, 174 or 27.7% have *left the GPO model entirely*. The fact that somewhere between a quarter and a third of customers now get their disposal medical supplies elsewhere, outside the proposed GPO Market, strongly suggests reasonably available alternatives.

Further, Smith's Declaration says, "a somewhat outdated GAO report stated that 72% of all purchases made by all US hospitals were through GPO-negotiated and administered contracts." While we observe that the report is from 2012, it is elementary that the *plaintiff* bears the burden of production. This court is not in a position to infer—as Endure heavily implies—that the number of hospitals departing from the GPO model has declined during the intervening period.

Smith's report also adds, "Another study reported that hospitals, on average, purchased 82% of general medical/surgical products through GPOs." That figure again undermines his theory, both because 18% pur-

chased through non-GPO sources suggests potential alternatives and because the 82% figure is itself an average, for which Endure fails to plead the underlying distribution of GPO purchase shares, which likely include higher and lower figures. As the district court stated, Endure "does not include these [alternative] channels as reasonably interchangeable substitutes" in its definition of the GPO Market.

Given these facts, the district court correctly concluded that though 98% of hospitals use GPOs, a significant portion of their purchases—almost a third—are outside GPOs. That renders the market legally insufficient and susceptible to summary judgment. *See PSKS*, 615 F.3d at 417; *E.I. du Pont*, 351 U.S. at 395.

This court has rejected proposed markets for similar reasons. In *Shah*, an organization of anesthesiologists agreed to provide anesthesiology services exclusively in a local hospital network. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021). After the organization terminated that agreement with a pediatric anesthesiologist, he was barred from further practicing in the local hospital network. *Id.* at 453. He filed an antitrust lawsuit, seeking to define the product market as "pediatric anesthesiologists." *Id.* at 455. This court rejected it as "insufficient as a matter of law" for failure to include reasonably interchangeable substitutes because the plaintiff did not identify "where people could practicably go" to acquire similar services within the geographic market. *Id.* at 454–55.

Most saliently, in *Dr.'s Hospital v. Southeast Medical Alliance, Inc.*, a hospital (DHJ) sued a competitor hospital and a membership organization that "welcomed the competitor into membership and booted out" DHJ, which sued. 123 F.3d 301, 303 (5th Cir. 1997). In defining the geographic market, DHJ attempted to establish an antitrust market of "the East Bank of Jefferson Parish." *Id.* at 311. According to plaintiff DHJ's expert, "over

thirty percent of East Bank residents obtained hospital care outside of the East Bank." *Id.* at 312. We affirmed the summary judgment on the basis that this geographic market was insufficient as a matter of law, reasoning that "the substantial percentage of East Bank residents who currently leave the East Bank for their hospital services is powerful evidence of alternatives reasonably available to consumers." *Id.* For that reason, the market was too "narrowly drawn." *Id.* (citation modified).

Endure tries to distinguish *Dr.'s Hospital* as geographic market definition—not product market definition. But "the criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market." *Brown Shoe*, 370 U.S. at 336. Indeed, as the district court correctly observed, the fact that almost 30% of hospital purchases are transacted *outside* the GPO model undermines the viability of Endure's GPO Market.[7]

## C.

We turn to Endure's second proposed definition of the "Vizient DMS Market," which Endure pleaded as covering the sale of DMS to Vizient Member GACs. According to Endure, this market is a submarket within the GPO Market.[8] This submarket captures "the marketing, supply, and distribution of disposable medical supplies by means of Vizient to Vizient Member

---

[7] We decline to rule on the D.C. Circuit's "core customer" theory proffered by Endure, given that that theory is nonbinding even within that Circuit. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039–41 (D.C. Cir. 2008). It also appeared nowhere in plaintiff's second amended complaint and thereby was not ruled on by the district court and is forfeited on appeal.

[8] To the extent that Endure tries to distinguish it as a submarket, we note the pleading standards of markets and submarkets are economically equivalent, even if qualitative factors may occasionally explore the distinction. *PSKS*, 615 F.3d at 418.

Hospitals" (emphasis added). As to reasonable interchangeability, Endure claims that "commercial realities" are such that "there are practically no interchangeable substitutes for Member Hospitals to [disposable medical supplies] except through Vizient." According to Endure, Vizient's incentive programs (ISPs, or Impact Standardization Program) "effectively lock in Member Hospitals to purchasing [disposable medical supplies] exclusively through Vizient." For that reason, Endure maintains that Vizient's "Member Hospitals . . . cannot afford to forego [*sic*] purchasing . . . [disposable medical supplies] through Vizient because it is cost-prohibitive for Member Hospitals to switch to a new GPO." As to price, Endure claimed that "prices of [disposable medical supplies] sold through Vizient are not meaningfully constrained by the price of alternative distribution methods."

At the summary judgment stage, Vizient contended that the Vizient Submarket was legally insufficient for the same reasons as the GPO Market and that "it is presumptively improper to limit an antitrust market to the defendant's business or its customers, absent exceptional market conditions that are not present here." Endure countered that Smith's report shows that Vizient "serves more than half of acute care systems and 97% of academic centers, which require access to a vast array . . . of products." Serving a set of hospitals is not the same, however, as either satisfying their full demand or limiting their access to reasonably interchangeable alternative suppliers. Even so, according to Smith, because the "purchase volume" of Vizient's Member Hospitals is so high, those Member Hospitals "cannot easily switch to alternative sources of supply, even for a significant price reduction."

Endure also muddied its second proposed definition by claiming that the Vizient submarket "includes DMS sales both through Vizient's GPO network *and outside of* Vizient's GPO" (emphasis added). Endure appears to plead a wider definition on appeal than at the summary judgment stage. While this court "may affirm summary judgment on any ground supported

by the record, even if it is different from that relied on by the district court," *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021), generally, the Court "will not reach the merits of an issue not considered by the district court," *PHH Mortg. Co. v. Old Republic Nat'l Tit. Ins. Co.*, 80 F.4th 555, 563 (5th Cir. 2023), absent special circumstances, *Baker v. Bell*, 630 F.2d 1046, 1056 (5th Cir. 1980). Those special circumstances exist only where "the proper resolution is beyond any doubt" and those in which "injustice might otherwise result." *Id.*

Here, the proper resolution is likely "beyond doubt" because, within the summary judgment framework, Endure has not "identified specific evidence in the record" to anchor this market definition, nor has it "articulate[d] the precise manner in which that evidence supports [its] claim." *See Shah*, 985 F.3d at 453. Rule 56 does not require a court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992). Therefore, summary judgment on each interpretation is appropriate.

On the merits of the Vizient DMS Market, the general rule is, "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." *Domed Stadium Hotel*, 732 F.2d at 488. The only exception is where "consumers are 'locked in' to a specific brand by the nature of the product." *PSKS*, 615 F.3d at 418. The Supreme Court established this exception in *Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 481–82 (1992).

As the district court observed, the summary judgment record includes no evidence that Vizient GPO members—or any other suppliers of DMS, for that matter—were "locked in." Although Endure alleges that Vizient's incentive programs "lock in" its GPO members, that purely price approach to lock-in is disfavored by this court's precedent. *PSKS*, 615 F.3d

at 418; *Domed Stadium Hotel*, 732 F.2d at 488. In *Eastman Kodak* itself, the single brand lock-in was for proprietary parts tied into undesired in-house repair services. 504 U.S. at 456–58. Endure fails specifically to plead any qualitative differences between Vizient's GPO *service* and other GPO *services*.

Even considering the slightly-wider measure of *all demand* by Vizient Member GACs, given that Vizient enjoys only a 53% stake in the GPO market, it still seems highly likely that other GPOs would effectively constrain Vizient's pricing power with respect to its Member GACs. Endure also does not adduce or trace specific facts related to high costs of switching to other GPOs—which would be probative of lock-in—as is required to resist summary judgment. Therefore, a Vizient-member only GPO DMS demand market is too "narrowly drawn." *Dr.'s Hospital*, 123 F.3d at 312.

Finally, as discussed *supra*, the record appears to support the opposing view that Vizient Members can buy DMS through another GPO or directly from a supplier, as indicated by Smith's 27.7% non-GPO purchases figure. The Vizient Submarket therefore would not include all reasonably interchangeable substitutes defined fundamentally by cross-elasticity of demand. *See PSKS*, 615 F.3d at 418. For these reasons, the district court did not err in rejecting the Vizient Market.

\* \* \* \* \*

We elect not to address the remaining issues, such as Vizient's alleged competition through its NovaPlus private label, exclusive dealing, and market foreclosure, under the "well-established general rule [that] this court will not reach the merits of an issue not considered by the district court." *PHH Mortg.*, 80 F.4th at 563 (internal quotation omitted). As mentioned *supra*, "absent special circumstances, this court will not consider an issue passed over by the district court," where such special circumstances include where "'the proper resolution is beyond any doubt,' and those in which 'injustice

No. 22-20321

might otherwise result.'" *Id.* (quoting *Baker*, 630 F.2d at 1056).

\* \* \* \* \*

Endure has failed to satisfy its burden to establish a genuine dispute of material fact as to either of its proposed antitrust markets. The summary judgment is AFFIRMED.